UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------------

UNITED STATES OF AMERICA,

**MEMORANDUM & ORDER**

v.                                    15-CR-302 (MKB)

JOHN DOE,

Defendant.

-----------------------------------------------------------------

MARGO K. BRODIE, United States District Judge:

On June 15, 2015, the government filed a sealed Juvenile Information against Defendant

John Doe, charging him with one count of conspiracy to provide material support to a Foreign

Terrorist Organization in violation of 18 U.S.C. § 2339B.[1]  (Docket Entry No. 8.)  On July 14,

2015, the government moved pursuant to 18 U.S.C. § 5032 to transfer Defendant for adult

criminal prosecution.  On September 22, 2015, the Court conducted an evidentiary hearing and

heard oral argument on the government's motion.  For the reasons discussed below, the Court

grants the government's motion and transfers Defendant for adult criminal prosecution.

**I.    Background**

The charges in the Juvenile Information stem from Defendant's alleged participation in a

conspiracy to provide material support to a Foreign Terrorist Organization ("FTO"),[2]

---

[1]  Pursuant to the statutory requirements of the Juvenile Justice and Delinquency
Prevention Act ("JDA"), to date, all proceedings and documents in this case have been sealed.
18 U.S.C. § 5038(e).  The JDA requires that during a juvenile delinquency proceeding, neither
the name nor picture of any juvenile shall be made public.  *Id.*

[2]  The allegations set forth are taken from the government's motion papers and supporting
documents and the evidence presented at the September 22, 2015 hearing.  On a transfer motion,

specifically, the Islamic State of Iraq and the Levant ("ISIL").[3]  Defendant's arrest, and the

subsequent charges, followed an investigation by the Federal Bureau of Investigation's Joint

Terrorism Task Force ("JTTF") into the activities of Defendant and others, including Munther

Omar Saleh.  (GX 1 ¶ 3.[4])

### a.  Defendant's background and relationship with Saleh

Defendant, a United States citizen, was born on ▮▮▮▮▮▮▮▮, and, prior to his arrest,

lived in Queens, New York.  (GX 1 ¶ 4; GX 2.)  Saleh was Defendant's friend, who also lived in

Queens before being arrested with Defendant.  (GX 1 ¶¶ 3, 5.)  Defendant and Saleh visited and

prayed at the same mosque in Queens and sometimes discussed spirituality, religion and politics

together, and Defendant sometimes sought "religious guidance" from Saleh.[5]  (GX 1 ¶¶ 17, 19;

GX 14B; Sept. 22, 2015 Hr'g Tr. ("Tr.") 88:5–90:1.)  Defendant and Saleh would also discuss

ISIL.  (GX 1 ¶ 14; GX 14A.)

Through judicially authorized surveillance, law enforcement learned that Defendant and

Saleh discussed their admiration for ISIL and the organization's tactics and goals.  (GX 1 ¶ 14;

---

the Court must "assume that, for the purposes of the transfer hearing, the juvenile committed the
offense charged in the Information."  *United States v. Nelson*, 68 F.3d 583, 589 (2d Cir. 1995).

[3]  ISIL is one of many aliases for al-Qa-ida in Iraq ("AQI"), a group that the United
States Secretary of State designated as a FTO in October of 2005.  (Gov. Mem. in Support of
Mot. to Transfer ("Gov. Mem.") 2, Docket Entry No. 25.)  On May 15, 2014, the Secretary of
State amended AQI's FTO designation to add its alias ISIL as the AQI's primary name along
with the following aliases for ISIL: the Islamic State of Iraq and al-Sham, Daesh, Dawla al
Islamiya and Al-Furqan Establishment of Media Production.  (*Id.*)

[4]  Throughout this Memorandum and Order, the Court refers to exhibits offered at the
September 22, 2015 transfer hearing as "GX __" for the government exhibits, and "DX __" for
Defendant's exhibits.

[5]  On occasion, Defendant referred to Saleh as his "Mufti hotline" and "Sheikh hotline."
(GX 1 ¶ 17.)  The government asserts that "Mufti" refers to an Islamic scholar.  (*Id.*)

2

GX 14A.) In May of 2015, Defendant sent a text-message to Saleh, stating, "I've been looking more into it . . . we should talk in person . . . Bro . . . we have this Friday too so you can tell me more about it . . . . it just makes sense." (GX 1 ¶ 14 (ellipses in original); GX 14A.) In response, Saleh asked Defendant, "U mean establishing Islam the same way the Prophet (saaws) did?" to which Defendant replied, "Yeah and dude it's like their [sic] doing it step by step and perfectly . . . The exact ways and rules of the prophet . . . I was watching an inside doc on dawlah."[6] (GX 1 ¶ 14 (ellipses in original); GX 14A.) Defendant then stated "Inshallah we can meet up lol . . . my brother also gets back tomorrow," to which Saleh replied, "haha alhamdulilah we can continue this talk in person;))." (GX 1 ¶ 14; GX 14A.) Later that day, Defendant planned to pick up Saleh, and when Saleh text-messaged Defendant to ask where they were going, Defendant jokingly responded "Dawla, no kiddin', the masjid." (GX 1 ¶ 14.)

On or about June 10, 2015, Defendant accessed websites related to ISIL, Islamic pronouncements about the use of violence, and the role of jihadist theology in armed conflict. (GX 1 ¶ 20.) Two days later, Defendant discussed religious beliefs with another individual who remarked that he wanted to help homeless people but had been "bothered" by the police for doing so. (GX 1 ¶ 21.) In response, Defendant stated that he did not "go by those laws" and was "down for the trouble," stating, "[e]ven if I did get arrested, I'd be happy [because] we did [it] for a right reason." (GX 1 ¶ 21 (second and third alterations in original).)

### b. Defendant and Saleh's alleged plot and subsequent arrest

According to the government's submissions, the JTTF's investigation uncovered Defendant's efforts to assist Saleh in a plan to prepare an explosive device for detonation in the

---

[6] The government asserts that "Dawla al Islamiya" is a known alias of ISIL and that Defendant's use of "dawlah" was a reference to ISIL. (GX 1 ¶ 14.)

New York metropolitan area. (GX 1 ¶¶ 8–9, 11.) On or about May 7, 2015, Saleh emailed himself information about constructing a "pressure cooker bomb," which included lists of the components for such a device. (GX 1 ¶ 9.) That day, Saleh told a confidential source that he was "in NY and trying to do an Op[eration]." (GX 1 ¶ 10; Tr. 41:1–3.) On or about May 17, 2015, Defendant accessed an internet-marketplace and viewed various items, including a sewing machine, chemistry model, drill, lava lamp, a pair of "FDA Approved" work gloves and an "Instant Pot" pressure cooker with an electronic timer. (GX 1 ¶ 22.) The government alleges that Defendant's banking records, which revealed unusually large cash withdrawals, shows that Defendant supported Saleh financially in Saleh's efforts to acquire the components for an explosive device. (GX 1 ¶¶ 24–25.)

On or about May 29, 2015, Defendant told Saleh that while Defendant was driving, he noticed a law enforcement vehicle following him and was able to evade and then follow the vehicle. (GX 1 ¶ 27.) Defendant told Saleh that he had seen law enforcement following him in the past, and believed that they were likely listening to their phone calls. (*Id.*) On or about June 9, 2015, Defendant also informed a third-party that he knew law enforcement was surveilling him and that his phone calls were being recorded. (GX 1 ¶ 28.) Defendant also discussed how to evade law enforcement surveillance. (*Id.*)

In the early morning hours of June 19, 2015, while conducting surveillance, law enforcement observed an unnamed co-conspirator driving Defendant and Saleh in a sport utility vehicle ("SUV"). (GX 1 ¶ 32.) Law enforcement observed them visit a car-wash where they vacuumed the interior of the vehicle. (*Id.*) Thereafter, law enforcement observed the SUV perform "anti-surveillance maneuvers" and then follow another law enforcement vehicle that had been surveilling the SUV. (*Id.*) At approximately 4:00 AM, both the SUV and a law

4

enforcement vehicle stopped at an intersection. (GX 1 ¶ 33.) Defendant and Saleh got out of the SUV and approached the law enforcement vehicle but then got back into to the SUV. (*Id.*) Thereafter, Defendant and Saleh got out of the SUV again, this time running towards the law enforcement vehicle on each of its sides. (*Id.*) As Defendant and Saleh approached the law enforcement vehicle, the driver of that vehicle reversed the vehicle to escape, and a second law enforcement vehicle arrived on the scene. (*Id.*) The driver of the second law enforcement vehicle ordered Defendants to the ground at gunpoint. (GX 1 ¶¶ 33–34; Tr. 78:25–79:11; Gov. Mem. 3.) Defendant and Saleh were then arrested.[7]

## II.  Discussion

### a.  Standard of review

Under the JDA, a juvenile who is at least fifteen-years-old, and who has allegedly committed an act that, if committed by an adult, "would be a felony that is a crime of violence," may be prosecuted as an adult if the Attorney General moves to transfer the juvenile for adult criminal prosecution, and a district court "finds that it is 'in the interest of justice' to grant a transfer." *United States v. Nelson*, 68 F.3d 583, 588 (2d Cir. 1995) ("*Nelson I*") (quoting 18 U.S.C. § 5032).

In weighing a motion to transfer, the district court must consider six factors: "(1) the juvenile's age and social background; (2) the nature of the offense alleged; (3) the nature and extent of any prior delinquency record; (4) present psychological maturity and intellectual development; (5) the juvenile's response to past treatment efforts and the nature of those efforts; and (6) available programs that are designed to treat the juvenile's behavior problems." *United*

---

[7] It is unclear from the parties' submissions whether the third individual, who was purportedly driving the SUV at some point prior to this confrontation, was present at that time and, if so, whether he was also arrested.

*States v. Sealed Defendant 1*, 563 F. App'x 91, 91 (2d Cir. 2014) (quoting *Nelson I*, 68 F.3d at 588).

"In deciding whether to transfer a juvenile defendant to adult status, the district court need not accord each of the six factors equal weight — the court may balance the factors in any manner it feels appropriate." *United States v. Nelson*, 90 F.3d 636, 640 (2d Cir. 1996) ("*Nelson II*"). The court's inquiry is "permeated" by the juvenile system's goal of rehabilitation. *See Nelson II*, 90 F.3d at 640. "Nevertheless, even though a juvenile's potential for rehabilitation is a 'crucial determinant in the transfer decision,' this factor 'must be balanced against the threat to society posed by juvenile crime.'" *United States v. Juvenile Male*, 844 F. Supp. 2d 312, 316 (E.D.N.Y. 2011) (quoting *Nelson II*, 90 F.3d at 640). As a result, a "glimmer of hope" for future rehabilitation is insufficient, and the court must determine if the juvenile is likely to respond to rehabilitative efforts by striking the "appropriate balance [between] . . . affording a defendant juvenile status when rehabilitation will work (and the rehabilitative goals of the juvenile system will be achieved), and allowing transfer to adult status when it will not (and the concerns of public protection and punishment become paramount)." *Juvenile Male*, 844 F. Supp. 2d at 316 (quoting *Nelson II*, 90 F.3d at 640). Given the presumption in favor of juvenile adjudication, "the burden is 'on the government to establish that transfer to adult status is warranted.'" *United States v. Ramirez*, 297 F.3d 185, 192 (2d Cir. 2002) (quoting *Nelson I*, 68 F.3d at 588).

**b.  Qualifications for transfer**

The government asserts that it has established the statutory prerequisites for transfer and that the six relevant factors weigh in favor of transfer. (Gov. Mem. 23.) Defendant does not contest certain statutory requirements: he admits that he was seventeen-years-old at the time of the charged crime and that the Attorney General has approved his transfer for adult criminal

prosecution. (Def. Opp'n to Gov. Mot. to Transfer ("Def. Opp'n"), Docket Entry No. 24.)

However, Defendant argues that (1) the six factors weigh against transfer and (2) the government

cannot establish that Defendant is charged with a "crime of violence" as required under the JDA,

because that term is void-for-vagueness. (Def. Opp'n 8–18; Def. Supp. Mem. in Opp'n to Mot.

to Transfer ("Def. Supp. Mem.") 1–5, Docket Entry No. 26.) Before turning to the six factors

relevant to transfer under the JDA, the Court addresses the threshold constitutional issue raised

by Defendant.

### i. Crime of violence

The JDA provides, in pertinent part, that a juvenile "shall not be proceeded against in any

court of the United States unless the Attorney General, after investigation, certifies to the

appropriate district court of the United States that . . . the offense charged is a crime of violence

that is a felony . . . ." 18 U.S.C. § 5032; *see also United States v. Doe*, 49 F.3d 859, 866 (2d Cir.

1995). Although the JDA does not define "crime of violence," the Second Circuit has held that

the federal Criminal Code's general definition of a "crime of violence," found at 18 U.S.C. § 16,

applies. *Doe*, 49 F.3d at 866 ("Since the JDA itself contains no definition of 'crime of violence,'

the district court properly looked to the general definition provisions set out at the start of the

Criminal Code." (citing 18 U.S.C. § 16)); *see also United States v. C.A.M.*, 251 F. App'x 194,

195 (4th Cir. 2007) ("The [JDA] does not define crime of violence. However, courts have used

the definition of crime of violence set out in 18 U.S.C. § 16." (citing *Doe*, 49 F.3d at 866)).

Under 18 U.S.C. § 16, a "crime of violence" is:

> (a) an offense that has as an element the use, attempted use, or
> threatened use of physical force against the person or property of
> another, or (b) any other offense that is a felony and that, by its
> nature, involves a substantial risk that physical force against the
> person or property of another may be used in the course of
> committing the offense.

7

18 U.S.C. § 16. In determining whether a particular offense qualifies under this provision, a

court "necessarily begin[s] with the plain language of [the relevant] statute." *Vargas-Sarmiento*

*v. U.S. Dep't of Justice*, 448 F.3d 159, 168–69 (2d Cir. 2006) (citing *Leocal v. Ashcroft*, 543 U.S.

1, 8 (2004)). To qualify under § 16(a), a given statute must include "the use, attempted use, or

threatened use of physical force against the person or property of another" as an element of the

offense. 18 U.S.C. § 16(a); *see also Chrzanoski v. Ashcroft*, 327 F.3d 188, 191 (2d Cir. 2003)

(discussing the applicability of § 16(a)). However, § 16(b) "sweeps more broadly" than § 16(a),

*Vargas-Sarmiento*, 448 F.3d at 169 (quoting *Leocal*, 543 U.S. at 10), as it has no element

requirement, 18 U.S.C. § 16(b). Instead, § 16(b) covers any felony that, "by its nature, involves

a substantial risk that physical force against the person or property of another may be used in the

course of committing the offense." 18 U.S.C. § 16(b). "Physical force," as this term is used in

§ 16(b), is "broadly defined" as "power, violence, or pressure directed against a person or thing."

*Vargas-Sarmiento*, 448 F.3d at 169 (quoting *Dickson v. Ashcroft*, 346 F.3d 44, 49–50 (2d Cir.

2003)); *see Santana v. Holder*, 714 F.3d 140, 143–44 (2d Cir. 2013).

Because § 16(b)'s definition of "crime of violence" focuses on an offense's "nature"

rather than its elements, courts apply a "categorical approach" to determine whether an offense

qualifies as a "crime of violence" under § 16(b). *See Santana*, 714 F.3d at 143; *Jobson v.*

*Ashcroft*, 326 F.3d 367, 372 (2d Cir. 2003) ("The categorical approach is not only consistent

with both precedent and sound policy, it is also necessary in view of the language of the

applicable statutes. Section 16(b) itself defines a crime of violence by its nature." (internal

citation and quotation marks omitted)); *Dalton v. Ashcroft*, 257 F.3d 200, 204 (2d Cir. 2001)

("Based upon the language of the statute requiring analysis of the 'nature' of the crime, as well

as by analogy to this Circuit's law regarding moral turpitude, we believe that the categorical

approach is appropriate for determining whether an offense is a crime of violence under

§ 16(b) . . . ."). "Under the categorical approach, 'the singular circumstances of an individual

petitioner's crimes should not be considered, and only the minimum criminal conduct necessary

to sustain a conviction under a given statute is relevant.'" *MacTaggart v. Lynch*, --- F. App'x ---,

---, 2015 WL 5010355, at \*1 (2d Cir. Aug. 25, 2015) (quoting *Pascual v. Holder*, 708 F.3d 403,

405 (2d Cir. 2013)). The focus is on "the intrinsic nature of the offense." *Santana*, 714 F.3d at

143 (quoting *Dalton*, 257 F.3d at 204).

### 1. Defendant's vagueness challenge to "crime of violence" under the JDA

Defendant objects to his transfer under the JDA, arguing that the government cannot

show that he is charged with a "crime of violence" because the term "crime of violence," used in

the JDA, is vague on its face and violates due process. (Def. Opp'n 8; Def. Supp. Mem. 1.)

According to Defendant, § 16(b) presents constitutional problems identical to those resolved by

the Supreme Court in *Johnson v. United States*, --- U.S. ---, 135 S. Ct. 2551 (2015), which struck

down the residual clause of the Armed Career Criminal Act's ("ACCA") definition of a "violent

felony." (Def. Opp'n 8; Def. Supp. Mem. 1.) The government asserts that the Court must

consider Defendant's vagueness challenge only as-applied to Defendant, and that under such

review, § 16(b) is not vague because conspiring to provide material support to a designated FTO

falls squarely within § 16(b)'s definition of a "crime of violence." (Gov. Reply Mem. in Support

of Mot. to Transfer ("Gov. Reply") 1–3, Docket Entry No. 23.) Defendant responds that even

under an as-applied review, the JDA's reference to "crime of violence" is unconstitutionally

vague because, under § 16(b), the Court must apply a categorical approach and engage in risk

estimation, which presents the same problems identified by the Supreme Court in *Johnson*. (Def.

Supp. Mem. 1; Tr. 135:13–136:3.)

9

"To ensure that persons are not denied liberty without due process, the law requires that criminal offenses be defined 'with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement.'" *Knife Rights, Inc. v. Vance*, --- F.3d ---, ---, 2015 WL 5559751, at *4 (2d Cir. Sept. 22, 2015) (quoting *Kolender v. Lawson*, 461 U.S. 352, 357 (1983)). The void-for-vagueness doctrine addresses these due process concerns, and may void a penal statute that "(1) 'fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits'" (the notice prong), or "(2) lacks 'explicit standards for those who apply [it]'" (the arbitrary enforcement prong). *Expressions Hair Design v. Schneiderman*, --- F. 3d ---, ---, 2015 WL 5692296, at *17 (2d Cir. Sept. 29, 2015) (alteration in original); *United States v. Rosen*, 716 F.3d 691, 699 (2d Cir. 2013). "The 'touchstone' of the notice prong 'is whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal.'" *Mannix v. Phillips*, 619 F.3d 187, 197 (2d Cir. 2010) (quoting *United States v. Lanier*, 520 U.S. 259, 267 (1997)). "The arbitrary enforcement prong requires that a statute give 'minimal guidelines' to law enforcement authorities, so as not to 'permit a standardless sweep that allows policemen, prosecutors, and juries to pursue their personal predilections.'" *Id.* (quoting *Kolender*, 461 U.S. at 358).

The Supreme Court recently held in *Johnson* that part of the definition of a "violent felony" in the ACCA was facially vague and violated due process. *Johnson*, --- U.S. at ---, 135 S. Ct. at 2563. Prior to *Johnson*, the ACCA defined "violent felony" as any felony that "is burglary, arson, or extortion, involves [the] use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another." 18 U.S.C. § 924(e)(2)(B). The Court held that the "residual clause" of this definition — "otherwise involves conduct that

10

presents a serious potential risk of physical injury to another" — was unconstitutionally vague. *Johnson*, --- U.S. at ---, 135 S. Ct. at 2563. Like 18 U.S.C. § 16(b), the ACCA's residual clause required courts to take a "categorical approach" when determining whether an offense qualified as a "violent felony" under the residual clause. *Id.* In *Johnson*, the Supreme Court emphasized "the indeterminacy of th[at] wide-ranging inquiry," and struck down the residual clause as unconstitutionally vague. *Id.* at ---, 135 S. Ct. at 2557–58, 2563.

According to the Court, "[t]wo features of the residual clause conspire[d] to make it unconstitutionally vague": (1) "uncertainty about how to estimate the risk posed by a crime" and (2) "uncertainty about how much risk it takes for a crime to qualify as a violent felony." *Id.* at ---, 135 S. Ct. at 2557. As to the uncertainty of estimating the risks posed by a crime, the Court emphasized that courts not only had to assess the risk of a crime based on a "judicially imagined 'ordinary case' of [that] crime," but also had to "imagin[e] how the idealized ordinary case of the crime subsequently plays out" in order to assess the risk of physical injury posed by the crime. *Id.* at ---, 135 S. Ct. at 2557–58. The Court held that the residual clause provided "no reliable way to choose between . . . competing accounts" of what risks of physical injury the ordinary case of a crime would involve, noting that a judicially imagined attempted burglary could just as easily involve a risk of physical injury — where, for example, a burglar encounters police, security or a homeowner — or none at all — where a homeowner yells and the burglar runs away. *Id.* at ---, 135 S. Ct. at 2557–58. As to the uncertainty about how much risk it takes for a crime to qualify as a violent felony, the Court emphasized that courts estimated this risk based on a judicially imagined set of facts and in light of the residual clause's enumerated offenses — burglary, arson, extortion, and crimes involving explosives — which were "far from clear in respect to the degree of risk each poses." *Id.* at ---, 135 S. Ct. at 2558 (quoting *Begay v.*

*United States*, 553 U.S. 137, 143 (2008)). According to the Court, the indeterminacy as to how exactly the risk posed by a particular crime should be measured, coupled with the indeterminacy of then identifying the quantum of risk necessary for the crime to qualify as a violent felony, produced "more unpredictability and arbitrariness than the Due Process Clause tolerates." *Id.* at ---, 135 S. Ct. at 2558.

In asking the Court to uphold the ACCA's residual clause, the government pointed to 18 U.S.C. § 16(b) and an appendix of other statutes, cautioning that they contained language similar to the ACCA's residual clause. Supp. Brief for Respondent at 22, App. A, *Johnson*, --- U.S. ---, 135 S. Ct. 2551 (No. 13-7120), 2015 WL 1284964, at *22, *1A. Citing the government's appendix in dissent, Justice Alito stated that "[i]f all these laws are unconstitutionally vague, [the majority's] decision is not a blast from a sawed-off shotgun; it is a nuclear explosion." *Johnson*, --- U.S. at ---, 135 S. Ct. at 2577 (Alito, J. dissenting). Justice Scalia, writing for the majority, dismissed these concerns, finding that while many of the cited laws did "use terms like 'substantial risk,' 'grave risk,' and 'unreasonable risk,'" unlike the ACCA, (1) they did not "link[] a phrase such as 'substantial risk' to a confusing list of examples," and (2) they "require[d] gauging the riskiness of conduct in which an individual defendant engages *on a particular occasion*." *Id.* at ---, 135 S. Ct. at 2561. Overruling its prior decisions in *James v. United States*, 550 U.S. 192 (2007) and *Sykes v. United States*, --- U.S. ---, 131 S. Ct. 2267 (2011), the Court struck down the ACCA's residual clause as unconstitutionally vague on its face. *Id.* at ---, 135 S. Ct. at 2562–63.

### A. Defendant's vagueness challenge is properly reviewed as-applied

Defendant asserts that in light of *Johnson*, 18 U.S.C. § 16(b)'s definition of "crime of violence" is unconstitutionally vague on its face, and the Court must deny the government's

transfer motion. (Def. Opp'n 8–11; Def. Supp. Mem. 1.) The government asserts that while

Defendant attempts to bring a facial challenge to the JDA, the Court must first evaluate any

vagueness challenge as-applied to the facts of Defendant's case. (Gov. Reply 2; Tr. 136:8–13.)

"A vagueness challenge may be either facial or as-applied." *Expressions Hair Design*, ---

F.3d at ---, 2015 WL 5692296, at *17. "Whether a facial void-for-vagueness challenge can be

maintained when . . . a challenge is *not* properly based on the First Amendment is unsettled."

*Dickerson v. Napolitano*, 604 F.3d 732, 743 (2d Cir. 2010); *see Expressions Hair Design*, ---

F.3d at ---, 2015 WL 5692296, at *17 (considering a facial vagueness challenge based on due

process); *Farrell v. Burke*, 449 F.3d 470, 495 n.11 (2d Cir. 2006) (highlighting the uncertainty as

to whether courts may review a facial vagueness challenge to a statute outside the First

Amendment context); *United States v. Rybicki*, 354 F.3d 124, 129–132 & n.3 (2d Cir. 2003)

(reviewing a due process vagueness challenge as-applied and finding the statute constitutional

as-applied, but proceeding to assess the facial validity of the statute); *see also United States v.*

*Farhane*, 634 F.3d 127, 138–39 (2d Cir. 2011) ("To the extent the Supreme Court has suggested

that a facial challenge may be maintained against a statute that does not reach conduct protected

by the First Amendment, the identified test is, in fact, only a variation on as-applied analysis,

requiring the defendant to show 'that the law is impermissibly vague in all of its applications.'"

(quoting *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 497

(1982))).

Regardless of whether facial vagueness challenges may be maintained outside of the First

Amendment context, the Court must first evaluate the statute as-applied. *See United States v.*

*Coppola*, 671 F.3d 220, 235 (2d Cir. 2012) ("[V]agueness challenges to statutes not threatening

First Amendment interests are examined in light of the facts of the case at hand; the statute is

13

judged on an as-applied basis." (quoting *Maynard v. Cartwright*, 486 U.S. 356, 361 (1988)));

*Farhane*, 634 F.3d at 138 ("[C]ourts generally view vagueness challenges to a statute as applied

to the defendant's case." (citing *Chapman v. United States*, 400 U.S. 453, 467 (1991))); *Mannix*,

619 F.3d at 197 (same). Accordingly, the proper starting point for a due process vagueness

challenge is as-applied to the case at hand. *See Expressions Hair Design*, --- F. 3d at ---, 2015

WL 5692296, at *17 (resolving a facial challenge by first considering the challenge as-applied to

challenger's case, stating, "Plaintiffs' as-applied challenge involving single-sticker-price sellers

fails, so under traditional standards, their facial challenge fails as well"); *Mannix*, 619 F.3d at

197 ("[O]ne to whose conduct a statute clearly applies may not successfully challenge it for

vagueness." (internal quotation marks omitted) (quoting *Parker v. Levy*, 417 U.S. 733, 756

(1974))).

     As the Second Circuit has noted, the preference for as-applied review follows from "the

principle that a person to whom a statute may constitutionally be applied will not be heard to

challenge that statute on the ground that it may conceivably be applied unconstitutionally to

others, in other situations not before the Court." *Farhane*, 634 F.3d at 138 (quoting *Parker*, 417

U.S. at 759). In a sense, this preference is rooted in a concern with preserving the separation of

powers and exercising judicial restraint, as it "serves the jurisprudential maxim that 'as between

two possible interpretations of a statute, by one of which it would be unconstitutional and by the

other valid,' a court's 'plain duty is to adopt that which will save the Act' enacted by Congress."

*Farhane*, 634 F.3d at 138 (quoting *Blodgett v. Holden*, 275 U.S. 142, 148 (1927) (Holmes, J.));

*Rybicki*, 354 F.3d at 149 (Raggi, J. concurring) (same).

     Here, although Defendant cites *Johnson* in support of his facial challenge to the JDA,

nothing in *Johnson* altered the well-settled rule in this Circuit that such challenges should first be

reviewed as-applied to the objecting Defendant.[8]  Because Defendant presents no compelling

reasons to depart from this rule, the Court first considers his challenge as-applied.

### B.   As applied to Defendant, "crime of violence" is not void-for-vagueness

The government argues that the term "crime of violence" under the JDA is not

unconstitutionally vague as-applied, because Defendant is charged with conspiring to provide

material support to a FTO.  (Gov. Mem. 8–10; Gov. Reply. 1–3.)  According to the government,

the material support statute, 18 U.S.C. § 2339B, explicitly contemplates the use of physical force

required to qualify as a "crime of violence" because it provides for enhanced punishment for

offenders whose material support results in the death of another.  (Gov. Mem. 8–10; Gov. Reply

3.)  In response, Defendant argues that because the Court must employ a categorical approach

and estimate the risks posed by the offense to determine whether material support qualifies as a

crime of violence, the constitutional infirmities identified in *Johnson* invalidate the JDA even as

applied to the charged conspiracy to provide material support.  (Def. Opp'n 10–11; Tr. 135:13–

136:3.)

In reviewing an as-applied challenge, courts focus on the twin concerns of the void-for-

vagueness doctrine — fair notice and arbitrary enforcement.  *See Farhane*, 634 F.3d at 139;

*United States v. Nadi*, 996 F.2d 548, 550 (2d Cir. 1993).  As to notice, "courts ask whether the

challenged 'statute, as written, provides notice sufficient to alert ordinary people [as to] what

conduct is prohibited.'"  *Farhane*, 634 F.3d at 139 (alteration in original) (quoting *Arriaga v.*

---

[8]  As the Second Circuit recently noted, *Johnson* seemingly creates a new mode of
analysis for facial vagueness challenges, given *Johnson*'s apparent rejection of the rule that to be
facially invalid outside the First Amendment context, a statute must be unconstitutionally vague
in all of its applications.  *Expressions Hair Design v. Schneiderman*, --- F.3d ---, ---, 2015 WL
5692296, at *19 (2d Cir. Sept. 29, 2015) (citing *Johnson v. United States*, --- U.S. ---, ---, 135 S.
Ct. 2551, 2560 (2015)).

*Mukasey*, 521 F.3d 219, 224 (2d Cir. 2008)). As to arbitrary enforcement, on an as-applied

review, even if a statute lacks "sufficiently clear standards" to eliminate a risk of arbitrary

enforcement, "a statute will survive . . . if 'the conduct at issue falls within the core of the

statute's prohibition, so that the enforcement before the court was not the result of the unfettered

latitude that law enforcement officers and factfinders might have in other, hypothetical

applications of the statute.'" *Farhane*, 634 F.3d at 139–40 (quoting *Farrell*, 449 F.3d at 494).

In the instant case, the Court considers whether an ordinary person would know that a

"crime of violence" under 18 U.S.C. § 16(b) encompasses a conspiracy to provide material

support to a FTO in violation of 18 U.S.C. § 2339B. That provision provides, in pertinent part:

> Whoever knowingly provides material support or resources to a
> foreign terrorist organization, or attempts or conspires to do so,
> shall be fined under this title or imprisoned not more than 20 years,
> or both, and, if the death of any person results, shall be imprisoned
> for any term of years or for life.

18 U.S.C. § 2339B. Material support includes:

> any property, tangible or intangible, or service, including currency
> or monetary instruments or financial securities, financial services,
> lodging, training, expert advice or assistance, safehouses, false
> documentation or identification, communications equipment,
> facilities, weapons, lethal substances, explosives, personnel (1 or
> more individuals who may be or include oneself), and
> transportation, except medicine or religious materials.

18 U.S.C. § 2339A. To be culpable, § 2339B explicitly requires that an actor know one of three

things about the organization he or she is materially supporting: (1) that the organization is a

"terrorist organization;" (2) that the organization has engaged in or engages in "terrorist

activity;" or (3) that the organization has engaged in or engages in "terrorism."[9] 18 U.S.C.

---

[9] 18 U.S.C. § 2339B looks to other statutes to define "terrorist organization," "terrorist
activity" and "terrorism." 18 U.S.C. § 2339B. The statute cross-references the Immigration and
Nationality Act ("INA") definition of "terrorist activity," which includes acts involving, among

§ 2339B. The Second Circuit has not addressed whether providing material support, on its own, qualifies as a "crime of violence" under 18 U.S.C. § 16(b). However, the few district courts that have considered the issue have found that it does. *See United States v. Goba*, 240 F. Supp. 2d 242, 251 (W.D.N.Y. 2003); *United States v. Lindh*, 212 F. Supp. 2d 541, 578–82 (E.D. Va. 2002); *see also United States v. Viglakis*, No. 12-CR-585, 2013 WL 4477023, at *7 (S.D.N.Y. Aug. 14, 2013) (identifying material support in violation of 18 U.S.C. § 2339B as the predicate "crime of violence" required for the firearms charge under 18 U.S.C. § 924(c)(e), which defines "crime of violence" with language identical to that in 18 U.S.C. § 16(b)); *United States v. Ahmed*, No. 10-CR-131, 2012 WL 983545, at *3 (S.D.N.Y. Mar. 22, 2012) (same).

In *Lindh*, the defendant moved to dismiss part of an indictment charging him with using or carrying a firearm in violation of 18 U.S.C. § 924(c), arguing that his alleged material support of a FTO could not qualify as the predicate "crime of violence" required by 18 U.S.C. § 924(c). *Lindh*, 212 F. Supp. 2d at 578. The court rejected that argument and found that, under the "categorical approach," providing material support to a terrorist organization was, "by its

---

other things, "[a] violent attack upon an internationally protected person . . . or upon the liberty of such a person," "[a]n assassination," or the use of any explosives, firearms, or other weapon or dangerous device "with intent to endanger, directly or indirectly, the safety of one or more individuals or to cause substantial damage to property." 8 U.S.C. § 1182(a)(3)(B)(iii)(I)–(V). Section 2339B also defines "terrorist organization[s]" as those organizations designated as "foreign terrorist organizations" under the INA, which permits that designation if the organization is (1) foreign; (2) engages in "terrorist activity" as defined in the INA; and (3) "the terrorist activity or terrorism of the organization threatens the security of United States nationals or the national security of the United States." 8 U.S.C. § 1189(a)(1)(A)–(C). Section 2339B also cross-references the Foreign Relations Authorization Act's definition of "terrorism," which "means premeditated, politically motivated violence perpetrated against noncombatant targets by subnational groups or clandestine agents." 22 U.S.C. § 2656f(d)(2).

nature," a crime of violence.[10]  *Id.* at 579.  The court emphasized that materially supporting

terrorist organizations by providing them "'weapons, lethal substances, [or] explosives,' . . . may

be just as deadly [as providing support through] 'currency or monetary instruments.'"  *Id.*

(alteration in original) (quoting 18 U.S.C. §§ 2339A, 2339B).  The court also highlighted the

statute's enhanced penalties for circumstances in which "death of any person results," finding

that this demonstrates Congress's concern with the violent nature inherent in providing material

support to a terrorist organization.  *Id.* (quoting 18 U.S.C. § 2339B).  As to the requirement that

the risk of force arise "in the course of committing" the offense, the court held that it need not

ignore the natural "consequences" and "risks" that are "attendant to the aiding and abetting of

terrorism proscribed by Section 2339B."  *Id.*  The court noted that the provision of material

support was similar to co-conspirators agreeing to commit a violent crime, where, although the

underlying agreement is non-violent, the conspiracy still qualifies as a crime of violence because

of the agreement's aims.  *Id.*

     Similar to the court in *Lindh*, the district court in *Goba* held that providing material

support constitutes a crime of violence under the Bail Reform Act.[11]  *Goba*, 240 F. Supp. 2d at

251.  Citing *Lindh*, the court held that under the categorical approached required by the Second

Circuit, "[w]hen one provides material support or resources to a terrorist organization, there is a

---

[10]  At the outset, the court noted that 18 U.S.C. § 924(c)(3), which defines "crime of violence," is identical to the definition in 18 U.S.C. § 16(b), and therefore, under the Second Circuit approach, required the court to take a categorical approach to determining whether material support qualified as a crime of violence.  *United States v. Lindh*, 212 F. Supp. 2d 541, 578 (E.D. Va. 2002).

[11]  The definition of "crime of violence" in the Bail Reform Act is identical to the definition in 18 U.S.C. § 16(b).  18 U.S.C. § 3156(a)(4)(B) (defining a crime of violence as a felony "that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense").

substantial risk that physical force against the person or property of another may be used in the course of committing the offense." *Id.* at 250 (quoting *Lindh*, 212 F. Supp. 2d at 579). As in *Lindh*, the court rejected the defendant's argument that in evaluating the risk of physical force the court must ignore the risks stemming from providing material support, and found that providing material support is akin to conspiracy to commit a violent crime. *Id.* at 250–51.

Here, the Court is not persuaded that § 16(b) fails to provide notice to an ordinary person that, "by its nature," conspiring to provide material support to a FTO will qualify as a crime of violence. The material support statute as a whole — the punitive scheme it sets out and the knowledge it requires to be guilty of the offense — compels the conclusion that § 16(b) does provide notice to the ordinary person that conspiring to provide material support to a FTO will qualify as a crime of violence.

First, as the government correctly notes, by including enhanced penalties in cases where "death of any persons results," the face of the statute at least contemplates that physical force may be required in committing the offense. Second, to be culpable, the material support statute requires that any material support be provided "knowingly," specifically, with the knowledge that the organization is a terrorist organization, or that the organization engages in or has engaged in terrorist activity or terrorism. 18 U.S.C. § 2339B. The statute's definitions for these terms — terrorist organization, terrorist activity and terrorism — demonstrate that the entire enterprise of providing material support to a FTO presents serious risk of physical force, as the definitions encompass a wide range of violent acts.

While a defendant need not carry out the "assassination," the "highjacking or sabotage of [a] conveyance," 8 U.S.C. § 1182(a)(3)(B)(iii)(I), the "premeditated, politically motivated violence perpetrated against noncombatant targets," 22 U.S.C. § 2656f(d)(2), or any of the other

violent acts that the terrorist organization engages in under § 2339B, it does not follow that providing material support to such an organization is not a crime of violence. An analogy to conspiracy is helpful. In the context of a conspiracy, "[t]he essence of the crime . . . is the *agreement* . . . to commit one or more unlawful acts." *United States v. Praddy*, 725 F.3d 147, 153 (2d Cir. 2013) (second alteration in original) (internal quotation marks omitted). Nevertheless, in determining whether that conspiracy qualifies as a crime of violence, courts consider "the nature of the conspiracy's substantive objective," which "may provide an indication as to whether the conspiracy creates the substantial risk that physical force against the person or property of another may be used in the offense." *Doe*, 49 F.3d at 866 (finding RICO conspiracy to commit robbery and extortion was a "crime of violence"); *see United States v. Ciccone*, 312 F.3d 535, 542 (2d Cir. 2002) ("[I]n determining whether a RICO conspiracy is a crime of violence under the Federal Sentencing Guidelines, 'the court must ask categorically oriented questions such as: Racketeering by what means? Racketeering to what end?'" (quoting *United States v. Winter*, 22 F.3d 15, 19 (1st Cir. 1994))). In the context of an agreement to commit armed robbery, the Second Circuit recognized that "[b]ecause the conspiracy itself provides a focal point for collective criminal action, attainment of the conspirators' objectives becomes instead a significant *probability*," warranting qualification as a crime of violence. *United States v. Chimurenga*, 760 F.2d 400, 404 (2d Cir. 1985).

This is also true as to material support. As the Supreme Court recognized, Congress prohibited the provision of material support or resources to these organizations, based on a finding that these organizations "are so tainted by their criminal conduct that any contribution to such an organization facilitates that conduct." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 7 (2010) (quoting Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), § 301(a)(7),

110 Stat. 1247, note following 18 U.S.C. § 2339B (Findings and Purpose)). In finding that § 2339B's proscriptions do not implicate First Amendment rights, the Supreme Court noted that even material support "meant to promot[e] peaceable, lawful conduct" is proscribed because, among other things, "'[m]aterial support' is a valuable resource by definition. Such support frees up other resources within the organization that may be put to violent ends." *Id.* at 30. As a result, "it takes little imagination" to conclude that a person choosing to violate § 2339B and provide material support to a terrorist organization is inherently furthering and increasing the risk that such violent physical force may be used against the person or property of another. *See Goba*, 240 F. Supp. 2d at 250 (quoting *Lindh*, 212 F. Supp. 2d at 581).

In reaching this conclusion, the Court rejects Defendant's argument that, under *Johnson*, "crime of violence" is vague even as-applied to § 2339B because the Court must apply a categorical approach and estimate risk in determining whether material support qualifies as a "crime of violence." This argument flows from a misreading of *Johnson*. Although the dissent in *Johnson* argued that the majority's language seemingly invalidated any statute requiring courts to use a categorical approach and estimate risk, the majority expressly rejected that reading of its holding, reaffirming the validity of the categorical approach and risk estimation. *Johnson*, --- U.S. at ---, 135 S. Ct. at 2561–62; *id.* at ---, 135 S. Ct. at 2577 (Alito, J. dissenting). First, the *Johnson* majority refused to "jettison" the categorical approach, noting that it "had good reasons to adopt the categorical approach," including Congress' focus on the category of an offender's conviction rather than the offender's conduct underlying that conviction. *Id.* at ---, 135 S. Ct. at 2562. Second, as to risk estimation, the *Johnson* majority emphasized that the Court "[did] not doubt the constitutionality of laws that call for the application of a qualitative standard such as 'substantial risk' to real-world conduct." *Id.* at ---, 135 S. Ct. at 2561.

Here, although the inquiry under § 16(b) is not focused on the elements or conduct underlying the material support charge, the Court finds that the risk estimation required to assess whether providing material support presents a substantial risk that physical force may be used falls short of the wide-ranging thought experiment previously required by the ACCA. This is so because of the central difference between § 16(b) and the ACCA's residual clause: § 16(b) is concerned with any risk that physical force may be used rather than the resultant risk of physical injury. *Compare* 18 U.S.C. § 16(b) (requiring a "substantial risk that physical force against the person or property of another may be used") *with id.* § 924(e)(2)(B)(ii) (requiring a "serious potential risk of physical injury to another"). This is a critical distinction that the Supreme Court and others have recognized. *See Leocal*, 543 U.S. at 10 n.7 (comparing § 16(b) with language identical to § 924(e)(2)(B)(ii) found in U.S.S.G. § 4B1.2(a)(2), and noting that § 16(b) "plainly does not encompass all offenses which create a 'substantial risk' that injury will result from a person's conduct," because, "[t]he 'substantial risk' in § 16(b) relates to the use of force, not to the possible effect of a person's conduct"); *Jobson*, 326 F.3d at 373 ("The risk of serious physical injury concerns the likely effect of the defendant's conduct, but the risk in section 16(b) concerns the defendant's likely use of violent force as a means to an end."). Indeed, "the risk that a defendant will use physical force in the commission of an offense is materially different from the risk that an offense will result in physical injury." *Jobson*, 326 F.3d at 372–73. As applied to a charge of conspiracy to provide material support, the difference between an estimation of the offense's risk of physical injury and the more cabined estimation of its risk of physical force support the Court's conclusion that, as-applied, the term "crime of violence" is not vague.[12]

_____

[12] The differing scope of a court's inquiry under § 16(b) and under the ACCA's residual

Accordingly, the Court finds that "crime of violence" is not unconstitutionally vague as applied to the charge of conspiracy to provide material support to a FTO. A judicially imagined conspiracy to provide material support to a FTO will always involve "a substantial risk of physical force against the person or property of another" given the necessarily violent actions of the FTO receiving support. When an ordinary person conspires to provide material support to such an organization, a simple review of the JDA and § 2339B provides sufficient notice that it would constitute a "crime of violence" as required for transfer under the JDA.[13]

The Court now turns to an assessment of the six factors to determine whether transfer is in the interests of justice.

### ii. Consideration of the six factors under the JDA

As it is undisputed that Defendant was over fifteen-years-old at the time of the charged offense, and, having found that Defendant is charged with a crime of violence, the Court turns to the evidence presented at the evidentiary hearing to assess the six factors that must be considered in weighing a motion to transfer.

### 1. Defendant's age and social background

In assessing a juvenile's age and social background, "[t]he Second Circuit has instructed that a district court should consider a juvenile defendant's age not only at the time of the offense, but also at the time of the transfer hearing." *Juvenile Male*, 844 F. Supp. 2d at 316 (citing *Nelson I*, 68 F.3d at 589); *see Nelson I*, 68 F.3d at 589 (holding that the district court erred in

---

clause would be similarly relevant in distinguishing *Johnson* on a facial challenge to § 16(b).

[13] Because the term "crime of violence" under the JDA is constitutional as-applied to Defendant's case, the Court does not proceed to consider Defendant's arguments that the term is facially invalid. *See United States v. Farhane*, 634 F.3d 127, 138–39 (2d Cir. 2011); *Mannix v. Phillips*, 619 F.3d 187, 197 (2d Cir. 2010).

failing to consider the defendant's age at the time of the transfer hearing). The closer a juvenile is to being eighteen-years old at the time of the offense or transfer motion, the more the juvenile's age weighs in favor of transfer. *See Sealed Defendant 1*, 563 F. App'x at 92 ("TW was just three months shy of his eighteenth birthday when he allegedly committed the offense and twenty years old at the time of the transfer hearing"); *Juvenile Male*, 844 F. Supp. 2d at 317 ("The closer the juvenile is to the age of majority, the more this factor weighs in favor of transfer." (citing *United States v. Juvenile Male*, 554 F.3d 456, 468–69 (4th Cir. 2009))); *United States v. H.V.T.*, No. 96-CR-244, 1997 WL 610767, at *3 (N.D.N.Y. Oct. 1, 1997) ("[Defendant] was almost 18 years old at the time of the conduct with which he is charged. Thus, the conduct did not occur when [Defendant] was very young, and age is a factor favoring transfer.")

Here, Defendant was born on ████████ and was ████████ shy of his eighteenth birthday at the time of his arrest on June 13, 2015. (GX 1 ¶ 3; GX 2; GX 3.) At the time of the September 22, 2015 transfer hearing, Defendant was eighteen-years and ████████ old. (Tr. 43:21–24; GX 2; GX 3.) The Court finds it significant that Defendant was seventeen-years-old throughout the time period covering Defendants' interaction with Saleh and others. This is not a case involving a defendant who, at a very young age, engaged in the offense conduct. Because Defendant was only ████████ shy of his eighteenth birthday at the time of his arrest, and because Defendant is presently over the age of eighteen, the Court finds that Defendant's age weighs heavily in favor of transfer. *See Sealed Defendant 1*, 563 F. App'x at 92; *Juvenile Male*, 844 F. Supp. 2d at 317.

As to Defendant's social background, the Court finds that this factor is neutral. The parties presented minimal evidence regarding Defendant's home life. The evidence establishes that Defendant has a two-parent family, and that both parents have been supportive of Defendant

throughout his life. (Tr. 82:23–25; 113:15–19.) For example, when Defendant's parents learned of Defendant's deficient academic performance, they both attended counseling sessions with Defendant and school administrators. (Tr. 46:2–13; GX 3.) Defendant's parents have also been supportive of Defendant in connection with the instant matter. They were present at Defendant's post-arrest interview and have attended all of Defendant's appearances before this Court. (Tr. 83:1–25, 113:15–19; GX 12.)

Defendant also appears to have some mentoring relationships. At home, Defendant had the presence of his older brother, who Defendant states was working on enlisting for military service and possibly pursuing a career in the law. (Def. Opp'n 7, 15.) Defendant also looked to ████████ for guidance in connection with the conduct at issue in this case. (Tr. 68:20–69:2.) As demonstrated by the recorded phone calls between Defendant and ████, Defendant sought ████'s counsel when he believed law enforcement was following him. ████ told Defendant that following law enforcement was not a good idea, instructing Defendant not to do anything without consulting him, and advising Defendant to stay away from Saleh. (Tr. 74:1–14; GX 9B; GX 9C.)

Although the complete picture is less than clear because of the lack of evidence regarding Defendant's family life, it does appear that Defendant's alleged conduct occurred despite him having supportive family members and mentors providing him with advice. Defendant's decision to engage in the offense conduct despite a support system has more bearing on Defendant's possible response to intervention and treatment, but also demonstrates that Defendant is surrounded by family and friends who create an environment conducive to successful rehabilitation. *Cf. United States v. Juvenile Male No. 2*, 761 F. Supp. 2d 27, 36 (E.D.N.Y. 2011) ("[G]iven the defendant's continuing and long-term affiliation with his gang

and the absence of any stable adult figures in his life who could possibly control his behavior, the Court finds that the defendant's social background makes it highly unlikely that he could be rehabilitated in the short period of time before he would have to be released from juvenile custody under federal law.").

The Court finds that Defendant's social background does not weigh for or against transfer, but given Defendant's proximity to the age of majority at the time of the offense and his age at the time of the transfer hearing, his age weighs heavily in favor of transfer.

## 2.  Nature of the alleged offense

As stated at the outset, "a district court should not undertake an examination of the strength of the government's evidence in evaluating a transfer motion, but instead should 'assume that, for the purposes of the transfer hearing, the juvenile committed the offense charged in the Information.'" *Juvenile Male*, 844 F. Supp. 2d at 319 (quoting *Nelson I*, 68 F.3d at 589).

The nature of the charged offense is serious.[14] Defendant conspired to provide material support to a FTO, a crime that, as discussed above, is inherently violent. In addition, the risks created by the charged conspiracy were not abstract, and unlike other seemingly "benign" forms of material support, the conspiracy specifically involved the potential use of violence. The government alleges that Defendant and his co-conspirators planned to provide material support to ISIL by manufacturing and detonating a "pressure cooker bomb." (GX 1 ¶¶ 9, 22–23, 25.)

---

[14] Defendant asserts that the government has not claimed that Defendant planned to join ISIL abroad or assist others in doing so, and argues that Defendant's browsing of the internet for a pressure cooker, his time spent with Saleh, and Saleh and Defendant's actions in attempting to physically confront the individuals in the law enforcement surveillance vehicle fail to show that Defendant "planned to build or detonate a bomb on anyone's behalf." (Def. Opp'n 13.) However, the strength or weakness of the government's proof is irrelevant, as the Court must assume the government could prove that Defendant conspired to provide material support to a FTO. *See Nelson I*, 68 F.3d at 589.

In addition, the seriousness of Defendant's physical confrontation with law enforcement is reflected in the deliberation that preceded his actions. Having realized that law enforcement was following him, Defendant's initial reaction was curiosity and laughter during his phone conversations. (GX 9A; GX 9B.) Defendant subsequently became preoccupied with responding to the law enforcement surveillance, attempting, at times, to pursue law enforcement vehicles if he noticed them on the road, and discussing what he would do the next time he believed law enforcement was following him. (GX 9A; GX 9B; GX 9D.) Ultimately, mere pursuit was not enough, and Defendant and Saleh, armed with knives, decided to physically confront law enforcement. (GX 1 ¶¶ 33–34; Tr. 78:17–79:22.) Although their ultimate goals were never accomplished, this fact does not undermine the serious nature of their alleged conspiracy. The Court finds that this factor weighs in favor of transfer.

### 3.  Nature and extent of Defendant's prior delinquency record

The government concedes that Defendant has never been adjudicated a juvenile delinquent, which weighs against transfer. *See United States v. Doe*, 710 F. Supp. 958, 961 (S.D.N.Y. 1989) (finding it "significant" that the juvenile had no prior contact with the criminal justice system noting that "a lack of a criminal record suggests the hope that this defendant may benefit from juvenile treatment . . . ."). The government argues that the Court should rely on police reports concerning incidents involving Defendant and the New York City Police Department, which incidents did not result in adjudication or a finding of juvenile delinquency, and conclude that this factor weighs in favor of transfer.

The Second Circuit has not directly addressed whether unadjudicated conduct like prior arrests may be considered in evaluating a juvenile's prior delinquency record on a motion to transfer. *See Juvenile Male*, 844 F. Supp. 2d at 320 n.10 (acknowledging the lack of Second

Circuit guidance); *United States v. Doe*, 74 F. Supp. 2d 310, 315 n.5 (S.D.N.Y. 1999) (finding

that the Second Circuit had given "implicit support to the notion that a juvenile's previous arrests

may be relevant to the 'prior juvenile record' factor." (citing *Doe*, 49 F.3d at 868–69)). Other

Circuits are split as to whether such evidence of unadjudicated conduct may be considered.

*Compare United States v. Wilson*, 149 F.3d 610, 613 (7th Cir. 1998) (finding that the factor

encompasses arrests and convictions) *with United States v. Juvenile LWO*, 160 F.3d 1179, 1183

(8th Cir. 1998) ("[S]ection 5032 does not authorize a judge to consider evidence of other crimes

in assessing the nature of the alleged offense." (internal quotation marks omitted) (quoting *In re*

*Sealed Case*, 893 F.3d 363, 365 (D.C. Cir. 1990))). *See also United States v. Anthony Y*, 172

F.3d 1249, 1254 (10th Cir. 1999) (noting circuit-split but refraining from adopting an approach,

finding that even limiting the evidence to adjudicated conduct it was relevant to other statutory

factors of psychological maturity and intellectual development or the nature of, and response to,

psychological treatments).

The Court does not consider Defendant's unadjudicated conduct in determining the scope

of his delinquency record, but considers it in assessing Defendant's psychological maturity and

intellectual development. Defendant's lack of juvenile convictions weighs against transfer.

However, the absence of a prior delinquency record is not dispositive. *See Juvenile Male*, 844 F.

Supp. 2d at 321 ("[A]n absence of a prior delinquency record is not dispositive in a transfer

determination and does not preclude the transfer of a defendant to adult status when, as in the

instant case, a balancing of all the statutory factors . . . weigh in favor of transfer.").

### 4.   Defendant's present psychological maturity and intellectual development

The Court finds that Defendant's psychological maturity and intellectual development

weighs in favor of transfer. Before Defendant turned eighteen-years-old, he sought and obtained

several jobs. (GX 7; Tr. 58:6–62:15; 63:16–20.) In 2014 and 2015, Defendant worked part-time

for a production company as a sound assistant and video camera operator. (Tr. 61:1–8.) In that

position, at the age of seventeen, Defendant traveled out of state on business trips. (Tr. 61:9–23.)

In ████████ 2014, when he was seventeen-years and ██████████, Defendant traveled to

Detroit, Michigan to work for a video production company at a convention. (Tr. 62:2–4;

GX 6B.) In May of 2015, Defendant traveled to Baltimore, Maryland to work for the same video

production company. (Tr. 62:7–9.) Defendant was not accompanied by his parents on his trip to

Maryland. (Tr. 62:10–15.) In 2014, Defendant was also employed by ███████████, a

pharmacy, and █████████████, a non-profit charity. (GX 6C; GX 7; Tr. 99:13–23.)

The evidence of Defendant's work history suggests a person with a substantial psychological

maturity and intellect, and his work with the video company, in particular, shows someone

capable of earning the trust of his employer.

Defendant also engaged in work-related misconduct that the Court finds relevant to the

evaluation of this factor. Defendant was terminated by █████████ for stealing, and it appears

from the evidence that Defendant also stole from another employer. While working for

█████████, Defendant stole money by forging payroll checks totaling $4425. (Tr. 99:9–25,

102:7–10; GX 6C.) In addition, according to notes purportedly kept by Defendant while

working at ████████████ and █████████, he stole $3500 and $2000 from each

respectively. (Tr. 98:24–99:6.) The government argues that Defendant's theft and fraud shows a

pattern of criminal behavior that increased in complexity, which evidences Defendant's maturity.

(Tr. 146:18–21.) Contrary to the government's argument, the Court is not persuaded that

Defendant's check forging was a particularly complex or sophisticated fraud scheme. The

scheme involved Defendant hand-printing false checks to match amounts printed on his

employer's computerized payroll checks. (*See* GX 6C.)

Although not sophisticated, the Court finds that Defendant's check fraud scheme is illustrative of a deliberative process similar to Defendant's actions in the charged offense. In executing his forgery scheme, Defendant obtained checks bearing the company's name and account numbers, and, rather than forging checks for large amounts, Defendant created each forged check for the same dollar amount listed on actual payroll checks his employer had already paid. (GX 6C.) Defendant continued to create false checks in amounts listed on paid checks even after his first successful forgery. (GX 6C.) This aspect of the scheme reflects some thought process by Defendant as to how to most effectively — rather than most lucratively — commit the crime.

In the instant case, the actions Defendant allegedly took upon realizing he was being followed by law enforcement reflect a similar deliberation that evidences some level of psychological maturity and intellectual development. Instead of immediately acting on impulse when Defendant believed he was being followed, he consulted with numerous people in the days leading up to his physical confrontation with law enforcement. (GX 9A; GX 9B; GX 9C; GX 9D.) Defendant asked ▇▇▇, "should I follow, should I just back up?" (GX 9B.) He told his brother that he had "no clue what to do," and told him about different ideas he had, telling him about a friend that could "carry a gun" but rejecting his brother's suggestion that he carry a brick to throw at the law enforcement vehicles. (GX 9D.) Ultimately, in the early morning of June 13, 2015, Defendant chose to follow a law enforcement vehicle and to physically confront its driver after weeks of deliberation about what he would do in the exact scenario. (GX 1 ¶¶ 32–34.) Although these acts evidence an ill-conceived plan, and one destined for failure, it was nevertheless a plan executed after a conscious and demonstrated weighing of options.

The Court's evaluation of Defendant's intellectual capacity is also informed by the journal he kept, purportedly memorializing "every single thing [Defendant] ever stole" or "did bad," both small and large dating back to his time in middle school. (GX 14C; GX 15A; GX 15B.) This journal recounts Defendant's theft from his prior jobs, and includes checkmarks for the misdeeds that Defendant "fixed." (Tr. 104:5–7; GX 14C; GX 15B.) This evidence shows Defendant's maturity; that he is someone who has an ability to reflect on what he has done and the capacity to recognize when his conduct is wrong. Taken together, these facts suggest that juvenile based rehabilitation would be less effective for Defendant. *See Nelson I*, 68 F.3d at 589 ("Indeed, the more mature a juvenile becomes, the harder it becomes to reform the juvenile's values and behavior." (citation and internal quotation marks omitted)).

Defendant argues that his failure to meet his family's expectations demonstrates his immaturity and weighs in favor of denying transfer. No evidence supporting these assertions was presented at the hearing, and the Court therefore cannot assess these claims. However, even assuming their truth, they do not undermine the Court's conclusion that Defendant's maturity and intellectual development weigh in favor of transfer.

### 5. Defendant's response to past treatment and the nature of those efforts

The Court finds that this factor weighs slightly against transfer, because the record lacks information about Defendant's prior treatment or counseling aside from counseling sessions about his academic performance. (Tr. 46:6–20.) Defendant's high-school records indicate that when Defendant was in danger of not graduating due to his academic performance and absences, the school counselor met with Defendant and his family. (Tr. 46:6–20; GX 3; DX D.) Contrary to the government's assertion, although the record reflects some continued academic issues, Defendant did ultimately graduate, suggesting that Defendant did respond to the counseling.

(GX 3.)

In arguing that this factor weighs in favor of transfer, the government asserts that Defendant ignored guidance from his parents and friends, asking him "to avoid contact with radical jihadists." (Gov. Mem. 21–22.) The government also cites to Defendant's alleged lies to law enforcement during his post-arrest interview. (*Id.*) Based on these facts, the government argues that Defendant "would likely serve as a hindrance to the efforts of the juvenile facility to rehabilitate other juveniles." (*Id.* at 22.) In addition to requiring the Court to make large leaps in logic, this conclusion does not address the essence of this factor. In light of rehabilitative goals central to the transfer analysis, the Court is concerned with how Defendant has responded to treatment in the past in order to predict how he may respond in the future. The minimal record presented suggests that Defendant has responded to some counseling, but neither party presented evidence from which the Court may assess Defendant's response to treatment. Accordingly, while this factor may weigh slightly against transfer, "a glimmer of hope in future treatment, standing alone, [is] insufficient to warrant a finding that rehabilitation is likely," and preclude transfer. *See Nelson I*, 68 F.3d at 590.

### 6. Availability of programs designed to treat Defendant's behavioral problems.

According to Peter Brustman, a contract oversight specialist with the Federal Bureau of Prisons ("BOP"), a juvenile convicted of a terrorism-related crime, like conspiracy to provide material support to a FTO, must be held in a "secure" facility. (Tr. 8:13–21.) However, because no secure juvenile facility exists in the State of New York, Brustman testified that the nearest suitable facility would likely be in Montana or South Dakota. (Tr. 10:19–11:1.) The government argues that because New York State has no secure facilities capable of housing a juvenile convicted of a terrorism crime, and because there are no juvenile programs available to

32

adequately "address the conditions that made him sympathetic to radical jihadist ideas," this factor weighs in favor of transfer. (Gov. Mem. 22.)

Here, "[f]or the government to carry its burden of persuasion, it must, of course, do more than merely assert the unavailability of an appropriate program. It must make a showing that it has investigated various options but is still unable to find a suitable and available program." *Nelson I*, 68 F.3d at 591. The government has failed to carry that burden. Although the government points to the juvenile facilities in Montana and South Dakota, Brustman testified that there are seven juvenile facilities available to house Defendant, including those in Washington D.C. and Portland, Maine. (Tr. 8:25–9:4.) In addition, while the government focuses on the lack of "de-radicalization" programming in the juvenile system, it fails to explain why the currently available programing would not sufficiently serve the interest of rehabilitating Defendant. According to the evidence presented at the hearing, these juvenile facilities provide programs such as gang awareness, which educate juvenile offenders and discourage gang involvement — concepts that appear to address the same issues and concerns raised by Defendant's alleged conduct in this case. (Tr. 9:23–4.) Although juveniles are assigned to such programs at the discretion of the BOP, there is no evidence that Defendant would not be eligible for these programs; rather, the evidence suggests only that the government views these programs as unsuitable. (Tr. 10:5–13.) The Court is also unaware of any impediments to the BOP creating programs designed to address "de-radicalization." Accordingly, this factor weighs against transfer.

*     *     *

In sum, having considered each factor, the Court finds that, collectively, they weigh in favor of transferring Defendant for adult criminal prosecution. Defendant was ███████ shy

of his eighteenth birthday throughout the time period of the underlying conspiracy and was eighteen years ██████████-old at the time of his transfer hearing. Thus, his age weighs heavily in favor of transfer. Defendant's course of conduct reflects a deliberate act in joining the alleged conspiracy and in engaging in the physical confrontation with law enforcement that precipitated his arrest. Therefore, given the nature of, and Defendant's participation in, the underlying conspiracy to provide material support to a FTO, this factor weighs heavily in favor of transfer. Defendant consistently sought and maintained employment, and his performance demonstrates his psychological maturity and intellect. Defendant's theft and forgeries from his employers also demonstrate Defendant's psychological maturity and intellectual capacity. Accordingly, this factor also weighs in favor of transfer. Defendant's lack of a juvenile record, positive response to the minimal counseling he has received, and the availability of programs to treat Defendant's behavioral problems weigh against transfer, but the Court assigns less weight to these factors than to the other factors.

## III.  Conclusion

For the reasons set forth above, the Court concludes that, under the JDA, Defendant is eligible to be transferred for adult criminal prosecution.  In addition, after thoroughly considering and balancing the six statutory factors set forth in 18 U.S.C. § 5032, the Court finds that transferring Defendant to adult status is in the interest of justice.  Accordingly, the Court grants the government's motion and transfers Defendant for adult criminal prosecution.

SO ORDERED:

_____s/ MKB_____
MARGO K. BRODIE
United States District Judge

Dated:  October 29, 2015
        Brooklyn, New York

35