UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------x
UNITED STATES OF AMERICA,    :
    :
    -against-    :
    :    15 CR 302 (MKB)
IMRAN RABBANI,    :
    :
    Juvenile    :
-------------------------------------------------x


# Imran Rabbani's Sentencing Memorandum


Green & Willstatter
*Attorneys for Imran Rabbani*
200 Mamaroneck Avenue, Suite 605
White Plains, New York 10601
(914) 948-5656


RICHARD D. WILLSTATTER
Of Counsel

Table of Contents

Introduction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

The Nature and Circumstances of the Offense. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

The False Allegations. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Objections to the Draft Pre-Sentence Investigation Report. . . . . . . . . . . . . . . . . . . . . . . 5

The Sentencing Guidelines Dispute. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

The History and Characteristics of the Defendant. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Other 3553(a) Factors. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Acceptance of Responsibility. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

ADDENDUM

Photographs of the Scene of Arrest

1. Google Earth Image of 20th Avenue and Whitestone Expressway
2. 20th Avenue facing east onto the overpass
3. 20th Avenue facing west onto the overpass
4. Second image of 20th Avenue facing west

Educational Certificates/Progress Reports

5. Law Day 2016–Recognition–Mock Trial– Sojourn High School/Rutgers School of Law–Newark
6. Letter of Prof. Laura Cohen, Rutgers School of Law, Newark
7. Award of Excellence–Sojourn High School, June 21, 2016
8. Award of Excellence–English/Language Arts
9. Certificate of Excellence–Sojourn High School, June 21, 2016
10. Grade Report, Jerry Bruno, Essex County College, June 22, 2016
11. Progress Report, Dr. Linda June, April 19, 2016–filed under seal
12. Memorandum of Dr. Jacqueline A. Young, Mar. 29, 2016

Letters of Support

13. Inam Rabbani

i

14.    Ikram Rabbani
15.    Ghulam and Kehkashan Rabbani
16.    Martin Levy
17.    Prema Saha
18.    Abdelghani Benyahya
19.    Jiann H. Lee
20.    Sarmad Karatela
21.    Waqas Khatri
22.    Rizwana Khatri
23.    Bilal Arif

<u>Introduction</u>

This Memorandum is respectfully submitted to address the question of whether a further sentence of imprisonment would be appropriate and reasonable for Imran Rabbani.

Mr. Rabbani is eighteen years old. He was arrested when he was 17. He has spent his eighteenth year in jail at the Essex County Juvenile Detention Facility.

The defendant was initially charged, by Juvenile Information, with conspiring to provide material support to a foreign terrorist organization. After holding a hearing on the government's motion to transfer the proceedings for adult prosecution, the Court granted the motion. Subsequently, the government revealed information that tended to exculpate the defendant and the defendant appealed. In consideration of the defendant's agreement to withdraw his appeal of the transfer order, the government offered and the defendant accepted a plea agreement. The defendant pleaded guilty to one count of conspiracy to interfere with federal officers in violation of Title 18, United States Code, Section 372 based on his conduct on the night of his arrest. The defendant agreed to be prosecuted as an adult on this charge.[1] The original charges in the Juvenile Information will be dismissed.

The government calculates the advisory sentencing range as 41 to 51 months' imprisonment while we believe, as will be explained, that the range is actually 30 to 37 months.

---

[1] At least one court has held that violations of Section 372 cannot qualify under the "force clause" of 18 U.S.C. § 16(a) and that Section 16(b)'s "residual clause" is unconstitutionally vague. *United States v. Bundy*, 2016 U.S. Dist. LEXIS 75812 (D. Or. June 10, 2016)(finding that § 372 is not a crime of violence within the meaning of § 924(c)(3)).

1

<u>The Nature and Circumstances of the Offense</u>

On Saturday morning, June 13, 2015, Mr. Rabbani and his then friend, Munther Omar Saleh, were riding in a Jeep Cherokee driven by another young man. The three young men saw that their car was being followed. The driver, known to Mr. Rabbani as Shah Faisal (Shah F. Jamaluddin), made unsuccessful efforts to evade the cars that were following them. When Faisal drove onto a bridge over the Whitestone Expressway, he stopped at a stoplight. Mr. Rabbani and Mr. Saleh emerged from the Cherokee and started walking toward the surveillance vehicle. It backed up. Rabbani and Saleh reentered the Cherokee and the surveillance vehicle pulled closer to the Cherokee. It was then that Rabbani and Saleh exited from the Cherokee a second time and began running toward the surveillance vehicle which quickly pulled back in reverse. Within moments, another car arrived and a federal law enforcement agent ordered Rabbani and Saleh to stop. Neither man resisted.

Imran and his friends had attended services at a mosque in Queens on Friday evening, June 12, 2015. They participated in late night and early morning religious discussions let by religious leaders in the manner of a retreat for contemplative thought. Mr. Rabbani did invite Muther Omar Saleh to attend these services although with several others. After the services were finished, Imran and others rode away with Shah Jamaluddin; some people were dropped off first. Their ultimate destination was the College Point Mosque where Mr. Jamaluddin taught as an imam to the children and held a copy of the keys. Jamaluddin planned to speak there that Saturday. While to those outside of this Queens Muslim community, it might seem odd for youngsters like Imran and his friends to be out late at night, from their point of view it was not unusual or strange.

The agents had been following the defendant by automobile for weeks and making

2

their presence –but not their identities– clear. On the morning of June 13, 2015, the defendant wanted to demand to know why he was followed when he approached what turned out to be an agent's car. He and Mr. Saleh planned to confront the driver of the surveillance vehicle and to demand that the agents stop following them. Mr. Rabbani had concluded that the men following him were likely to be federal agents although they had not identified themselves. He was thinking that the agents had no right to follow him around. He never intended to harm the agents but thought he could demand to know why he was being followed and insist it be stopped.

Although Saleh had expressed extremist views to Mr. Rabbani and others, Mr. Rabbani never purported to join Saleh in his adherence to ISIL and never sought to travel to join ISIL. Mr. Rabbani did feel threatened by the physical surveillance. He thought he was being followed and harassed because of his religious beliefs. But Mr. Rabbani and Mr. Saleh had no plan to attack the agent. Rather, they wanted to stop the agents from following them. And this conduct violated Section 372.

Section 372, prohibits:

> conspir[ing] to prevent, by force, intimidation, or threat, any person from accepting or holding any office, trust, or place of confidence under the United States, or from discharging any duties thereof, or to induce by like means any officer of the United States to leave the place, where his duties as an officer are required to be performed, or to injure him in his person or property on account of his lawful discharge of the duties of his office, or while engaged in the lawful discharge thereof, or to injure his property so as to molest, interrupt, hinder, or impede him in the discharge of his official duties.

3

18 U.S.C. § 372. The defendant conspired to intimidate the agents to stop them from discharging their duties (to keep him under physical surveillance) and to leave the place where their duties were required to be performed by trying to get them to stop.

Mr. Rabbani was arrested and did not resist. The agents found a knife in his waist band that he never took out and did not use against anyone. The agents also found a smaller knife in Saleh's pocket. No one saw Saleh ever take this knife out that night but, during his interrogation, Saleh stated that when he first alighted from the Cherokee that night, he briefly removed his knife from his pocket, put it back, and did not take it out again. There was no plan to use these weapons to attack the agent. Neither Rabbani nor Saleh displayed a weapon that morning or indicated to anyone, by word or deed, that they were armed and intended to use a weapon of any sort in any way.

The incident on June 13, 2015 was not the only time that Mr. Rabbani and his friends attempted to confront the surveillance vehicles. On Friday evening, June 5, 2015, Imran and some of his friends traveled to the Al-Aman Mosque in the Northeast Brooklyn neighborhood of Cypress Hills. Mr. Rabbani and his friends approached a surveillance vehicle that evening but it rode away. Call detail records for Mr. Rabbani's phone show that he then called 911 at 6:42 pm that evening, complaining that he was being followed. Special Agent Guida testified at the transfer hearing that he had heard a recording of the 911 call in which Mr. Rabbani made this complaint; the agent confirmed that police officers met with Mr. Rabbani near the Mosque concerning his complaint.

Mr. Rabbani's complaint to law enforcement shows that, far from devising a secret plan to stop the surveillance, he sought assistance from the police to stop it. Again, he never intended to harm the agents but wanted to demand to know why he was being followed.

4

The False Allegations

The government successfully sought the defendant's detention partly based on what has been revealed to be entirely false allegations. It had initially claimed that, on May 17, 2015, he searched the internet for bomb components. However, at a hearing on November 17, 2015, the government revealed, pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), that Imran Rabbani had never searched the internet for bomb components. Instead, the images of items that might have been used to construct a bomb were received by the defendant and thousands of other Amazon.com customers in email advertisements that were not specific to him or anyone else. Mr. Rabbani never searched for these items. Further, the two relevant Amazon emails that Imran Rabbani received included a variety of categories of products that Amazon hoped people would click on to purchase including "tablets" and "CD&Vinyl" but also "Cookware." The image that the government had alleged was of a pressure cooker "accessed" by Mr. Rabbani was located over the hyperlink for "Cookware." It was the image of an "Instant Pot" pressure or rice cooker that contained electronic buttons and a screen for cooking time.[2]  These sorts of email advertisements are routinely disseminated by Amazon.com and many other retailers. The fact is that Mr. Rabbani never planned to help Saleh or anyone else build or use a bomb.

Objections to the Draft Pre-Sentence Investigation Report

On June 29, 2016, fifteen days prior to the scheduled sentencing, the Probation Department disclosed the draft PSR. The defense filed its objections on July 6, 2016, one

---

[2]       In fact, the so-called bomb instructions Saleh allegedly emailed himself on May 7, 2015 explicitly stated that one should avoid buying a pressure cooker with electronic buttons and screens—precisely the type of cookware contained in Amazon's email to Imran Rabbani.

week later. Because we do not anticipate that the Probation Officer will issue a final report by the time this sentencing memorandum must be submitted, we provide our objections here by Paragraph number.

¶ 9.   The PSR states that, between June 3 and June 9, 2015, "Rabbani made approximately $1,000 in ATM cash withdrawals from a bank account he had access to (an account jointly held with his father), leaving a negligible balance. During the preceding months, he had made a total of $60 in cash ATM withdrawals." Actually, in November 2014, the defendant withdrew $500 from an ATM and in December 2014, he withdrew $1,660 in cash from ATMs. But he made few deposits into the joint checking account from January until May 2015 when he and his father deposited approximately $1,350 into the joint account; some of these funds were derived from the defendant's part-time work and some came from his father's personal account. The small number of cash withdrawals in the months preceding June reflected the lack of deposits into the account. Although $1,000 in cash was withdrawn in June, these withdrawals did not reflect or indicate a plan to assist Saleh in his activities. Those funds were kept at the defendant's home and were used by him and his family as needed.

¶ 10.   This conversation was with the defendant's friend, Prema Saha, but it did not indicate any interest in or propensity to commit acts of violence. The conversation indicated Imran Rabbani's willingness to be arrested if it turned out that helping the homeless was deemed to be unlawful. In fact, during this conversation, Imran asserted to Ms. Saha that, "Your community is your responsibility." The defendant was urging her to join him in an effort to help homeless people.

6

¶ 11.    Paragraph 11 of the draft PSR contains offense conduct information provided by the government to the United States Probation Department.

A.  The PSR quotes the government in Paragraph 11:

"It is the position of the Government that the conspirators chose that location [a red light signal at 20th Avenue, near the Whitestone Expressway] because it was isolated and a dead-end, essentially trapping the surveillance officer."

The government's position that the location was an isolated dead end is baseless and wrong. The Jeep and the surveillance vehicle stopped at the red light on the 20th Avenue overpass over the Whitestone Expressway. I attach a Google Earth representation of the location. There is no dead end there. The location is not isolated. It is in the middle of Queens with 20th Avenue extending east and west and crossing the service road for the Expressway on either side. I also attach street level images of the location facing both east and west.

B.    One sentence in ¶ 11 reads, "Per his own admissions, Saleh had an open folding knife in his hand when he first approached the surveillance car, but he claims that he closed it and placed it in his pocket when he went back to the Jeep." This is false.

On September 20, 2015, the government wrote a *Brady* letter to the defense providing favorable information to the defendant described as:

"Partially redacted excerpts from the post-arrest statement of Munther Saleh that relate to Imran Rabbani and to the assault on law enforcement on June 13, 2015, which have been categorized as Sensitive under paragraph 5 of the Stipulation and Protective Order entered by the Court on July 6, 2015

7

(IR0005119-IR0005202)."

Here are the relevant sections:

Agent 1:      Did you have that knife out when you ran today?

MS:           Mmm it was in my pocket.

Agent 1:      You sure?

MS:           Pocket. No I had it out . . . wh in my hand closed I when I faced toward the car the first time.

Agent 2:      Okay.

MS:           Then we went back into the car, I put it in my pocket.

*      *      *

Agent 1:      Then I mean you guys were re if you need to you are ready to use them? (Noise)

MS:           Nnnn no no because my ah knife need ta be opened like carefully and everything.

Agent 1:      Mm hmm. What about his?

MS:           It's not the kind if you could just . . . his you can flip out.

It is clear from these excerpts that (1) Saleh never said he opened his knife (2) he said it was "closed when [he] faced the car the first time" and (3) according to Saleh, Saleh's knife needed to be opened "carefully" as opposed to Rabbani's knife which could be flipped open. The defense alerted the government of this error in its factual representation to the United States Probation Department. On July 6, 2016, the government consented to the correction we seek to the effect that there is no evidence Saleh ever opened a knife that morning.

8

¶ 13.   A.   The box kept at Imran's home did have cash he kept there, but it did not amount to $1,000 because he spent some of the cash he withdrew before he was arrested.  The funds in the box were not seized when the agents searched the home; the agent who testified at the hearing was unaware of its existence.

B.   ¶ 13 includes the statement, "According to an FBI interview with a Pharmacena representative, Rabbani has been an employee who was fired for writing duplicate business checks totaling $4,425, and cashing the checks during December 2014." This is wrong; that is not what the Pharmacena representative told the FBI, according to the relevant 302 report. According to the Pharmacena representative, "most of the payroll checks would have been issued electronically by Quickbooks. [The representative] assumed the checks that were hand written on the same day of the Quickbooks check, were likely fraudulent." This statement is taken from an FBI 302 produced at the transfer hearing as GX 3500-RG-10. The $4,425 figure reflects all of the checks written to the order of Imran Rabbani in GX 6C, introduced in evidence at the transfer hearing and summarized in a chart introduced as GX 6D. That Exhibit showed that there was a total of $4,425 in checks from Pharmacena to the defendant; as the prosecutor made clear at the hearing, the total paid *did not* reflect the total amount stolen.

THE COURT:          Counsel, can you clarify for me is the testimony that all of the checks listed on 6D which you reviewed in 6C were stolen?

THE PROSECUTOR:     No, Your Honor, I don't believe that's the testimony.

THE COURT:          Okay.

THE PROSECUTOR:     I believe the testimony is just that the checks reflected in 6 --

the list of checks reflected in 6D reflects all of the checks that

are in Exhibit 6C.

THE COURT:     Okay. And then his testimony is that money was stolen and

some monies have been paid back.

THE PROSECUTOR:     That's correct, Your Honor.

THE COURT:     But there's no testimony as to which checks identified in 6C, if

any, were stolen.

THE PROSECUTOR:     That's correct, Your Honor. (Hearing transcript 102-103)

The total sum of the handwritten checks in GX 6C was $3,105.60.

¶ 17.   The statement attributed to the defendant requires some corrections.

    A.   One sentence in this paragraph reads, "Shortly before their arrests, Saleh
'talked politics' with the defendant 'all night long,' and they debated about
ISIL and slavery." The discussion with Saleh that evening included the
defendant and others who were present at the mosque and was not a
conversation just between Saleh and the defendant.

    B.   Another sentence in this paragraph reads, "Preceding his arrest for the
instant offense, the defendant recognized that the Government was watching
Saleh, which caused himself to become watched by law enforcement; this
made his feel persecuted, because he thought he did not warrant
surveillance." Mr. Rabbani stated that, in retrospect, looking back on the
events, he later concluded that the government was watching Saleh which
caused them to focus on him as well. At the time, however, he knew they were

both being followed but did not conclude that he himself was being followed as a result of his friendship with Saleh.

¶20.   A.   For the reasons stated above, ¶20's claim that "both participants charged the officer with knives, one with the knife open" is wrong and we object to it.

B.   Paragraph 20 also states that the offense was "an assault that involved a dangerous weapon with the intent to cause bodily injury." The offense was not an assault with intent to cause bodily injury. He conspired to intimidate the agents to induce them to leave the place where their duties as officers were required to be performed, that is, to stop surveilling him. This is the crime, a violation of 18 U.S.C. § 372, charged in the Information. No assault is charged in the information and no assault was attempted. Please note that ¶22's reference to "the assault" is also incorrect for this same reason.

¶21.   Paragraph 21 states that (1) the defendants "dr[ove] to a remote dead-end block" and (2) refers to an "initial stalled attempt to attack the officer." These claims are incorrect.

A.   As stated above, the defendant did not drive or ride to a remote dead-end block.

B.   There was no "initial stalled attempt to assault" the officer–there was no attempt to assault the officer at all. The defendant attempted to interfere with and stop the surveillance officers from conducting their surveillance of him by confronting him. But Imran Rabbani never planned to or tried to assault the officer.

¶22.   The three-level increase for the brandishing or threatened use of a dangerous

11

weapon pursuant to Section 2A2.2(b)(2)(C) cannot lawfully be applied to Mr. Rabbani.

Subsection (b)(2) provides:

> (2)    If (A) a firearm was discharged, increase by 5 levels; (B) a dangerous weapon (including a firearm) was otherwise used, increase by 4 levels; (C) a dangerous weapon (including a firearm) was brandished or its use was threatened, increase by 3 levels.

U.S.S.G. § 2A2.2(b)(2).

The term "brandished" is defined in the Commentary as having the meaning given it in §1B1.1 of the Guidelines. U.S.S.G. § 2A2.2, comment. n. 1. In turn, Section 1B1.1(1) of the Guidelines defines the term "brandished" as follows:

> (C)    "Brandished" with reference to a dangerous weapon (including a firearm) means that all or part of the weapon was displayed, or the presence of the weapon was otherwise made known to another person, in order to intimidate that person, regardless of whether the weapon was directly visible to that person. Accordingly, although the dangerous weapon does not have to be directly visible, the weapon must be present.

U.S.S.G. § 1B1.1(1)(C).

First, no part of Mr. Rabbani's knife was displayed when he got out of the Cherokee. It remained in his waistband the entire time. Nor did Mr. Rabbani do anything to make its presence known to intimidate anyone. The use of a weapon was never threatened. Mr. Rabbani wore a long, religious tunic that evening called a "Kameez." He would have had to

12

pull up this garment to access the knife he carried on his waistband — but he did not.

Second, although, during his interrogation, Saleh told the agents he briefly removed his small folding knife from his pocket when he initially got out of the Cherokee, he said he put it back into his pocket and never removed it again. Saleh's knife measured just three inches in length when folded–small enough that it would not have been clearly visible in the palm of a hand. No agent claims to have seen it. Nor did Saleh do anything to indicate to the surveillance agent that he had a weapon of any kind.  He did not open his folding knife, he did not hold it up for all to see, nor did he indicate in any way that he was armed.

The enhancement for brandishing a dangerous weapon or threatening its use applies when an offender brandishes a weapon or acts in such a manner as to make it appear that he is armed for the purpose of intimidating the victim. While the surveillance officer may well have felt intimidated when the defendant and Saleh ran toward his car, they did not brandish weapons or threaten their use. The enhancement does not apply to the mere possession of dangerous weapons by offenders.

Accordingly, the three-level increase advocated by the government cannot be applied and the resulting offense level is 22, not 25 as stated in PSR ¶26. After three levels are deducted for acceptance of responsibility, the adjusted offense level is 19 and, at CHC I, the resulting applicable advisory guideline is 30 to 37 months, not 41 to 51 months as stated in PSR ¶ 62.

¶ 39.   Imran Rabbani was once the victim of a crime, having intervened when a shoplifter tried to steal merchandise from a local grocery store. Imran was injured by the shoplifter during that incident. The PSR's detailed description of the murder of Maurice Parker should be deleted because it does not relate to the defendant.

13

¶ 41.   Dickinson College is located in Carlisle, Pennsylvania.

¶ 44.   The PSR states, "The father has always paid all the household bills, and allowed the defendant to keep his income earned from part-time jobs for himself." This is partially correct. Ghulam Rabbani had access to the joint bank account and at times withdrew money from that account for household expenses. For example, according to an FBI 302 introduced at the transfer hearing as DX C, "the majority of the transactions within this student account were conducted by GHULAM RABBANI." When it was possible, the defendant's father did pay his son back.

<u>The Sentencing Guidelines Dispute</u>

The only objection that will affect the sentencing guidelines' range is the question of whether the "brandishing" enhancement applies. By stipulation, the parties agreed that Section 2A2.2 of the United States Sentencing Guidelines applies here.[3]

In any event, the base offense level under Section 2A2.2 is 14. The parties agreed that the offense involved more than minimal planning so that two levels are added pursuant to Section 2A2.2(b)(1). And the parties agreed that a six-level increase may be applied because the JTTF officer was an "official victim" within the meaning of § U.S.S.G. § 3A1.2(b).

As described above, the government advocates for the application of a three-level increase for the brandishing or threatened use of a dangerous weapon pursuant to Section 2A2.2(b)(2)(C). For the reasons set for above, this enhancement cannot lawfully be applied to Mr. Rabbani.

---

[3]     Section 2A2.4 is the Guideline section for "Obstructing or Impeding Officers" carries a base offense level of 10 plus three level increase for possession of a dangerous weapon and explicitly excludes the application of any enhancement for official victim pursuant to Section 3A1.2.

14

Recently, the Supreme Court reaffirmed the need for a sentencing court to find the correct advisory sentencing range even if it intends to vary from that range. In *Molina-Martinez v. United States*, 136 S. Ct. 1338 (2016), the Court found that an error in selecting the sentencing guidelines will, in most cases, require resentencing. *Id.* at 1345-56; *Peugh v. United States*, 133 S. Ct. 2072, 2083 (2013)(Even if the sentencing judge sees a reason to vary from the Guidelines, if the judge uses the sentencing range as the beginning point to explain the decision to deviate from it, then the Guidelines are in a real sense the basis for the sentence). Accordingly, this Court should resolve the dispute at hand and find the applicable guidelines range to be 30 to 37 months' imprisonment.

<u>The History and Characteristics of the Defendant</u>

The Court learned some information about Mr. Rabbani at the transfer hearing, including:

- he had completed his course of studies at John Bowne High School in Queens and was scheduled to graduate in June 2015;

- he had no High School disciplinary record;

- A January 2015 letter of recommendation in his high school file described him as having "intellectual skills and maturity while being highly motivated";

- he had no juvenile delinquency record;

- on Halloween evening 2012, he was arrested for taking a motor vehicle without permission;

- he had been employed part-time by a video production company; and

- he had been employed by a pharmaceutical company but was terminated when it was leaned he had stolen money from the company–which he later repaid.

15

But there is much more to Imran Rabbani's life.

Imran Rabbani is the third child of five born to Ghulam and Kehkashan Rabbani. His parents emigrated to the United States more than twenty years ago and became naturalized American citizens. All five of their children were born in New York and are American citizens. Mr. and Mrs. Rabbani are native speakers of Urdu, the language spoken in their home. They are not highly educated themselves[4] but they encouraged their children to study hard in the New York City School system. While Mr. Rabbani's parents are devout members of the Queens Muslim community, they have never sought to prevent their children from participating in the secular world on New York City.

Ghulam Rabbani is the breadwinner of the family and makes a modest living as a limousine driver. However, working as an independent business owner also means that Mr. Rabbani has no benefits or safety net.  He has struggled to provide for his family. The defendant's father filed for bankruptcy in 1991, in 2003, and again in 2012. In 2004, Ghulam Rabbani had extensive heart surgery but, although he recovered from his illness, the time he lost from work (approximately one year) and the crushing medical debt that followed was devastating for him and his young family. Mrs. Rabbani is a homemaker but did not ordinarily contribute to her family's income. She is a talented cook, however, and at times cooked food to be distributed at religious events and was paid a small amount for her work on some occasions.

The Rabbani family resides in a small one bedroom apartment on Sanford Avenue in Flushing. Two parents and five children shared those close quarters. Despite the

---

[4]       Ghulam Rabbani obtained a degree in accountancy before emigrating to the United States.

economic challenges faced by the Rabbanis, the first two children succeeded in school.

The eldest of the children, Inam Rabbani, excelled in school and recently graduated from St. John's University with his bachelor's degree and received a partial scholarship to attend the law school there starting in August. Back in 2015, Inam attended the U.S. Army's "Starting Strong" program which he trained and explored his interest in going to law school and joining the Judge Advocate General Corps. This remains his goal. Inam also found work and some income at a financial services company, Primerica. He developed a friendship with Primerica's Regional Vice President, Jiann H. Lee. Inam's work ethic and steadfast adherence to morality worked for him and he encouraged his siblings to follow his path. Shortly before he was arrested, Imran approached Jiann Lee to see if he could intern at Primerica and Mr. Lee agreed. Mr. Lee opines that he believes Imran Rabbani "has a good heart" and that this past year "has substantially matured him."

In Inam Rabbani's letter to the Court, he points out that the defendant is not aggressive by nature but does offer his assistance to others. Inam believes that the defendant has matured into a man since he was imprisoned; rather than giving in to bitterness, he has focused on his education and career plans. In his letter, he vows to support his brother as he faces his future challenges. Imran Rabbani is fortunate to have a sibling who is dedicated to assuring his success.

The second oldest son, Ikram Rabbani, was the valedictorian at John Bowne High School and received a scholarship to attend Dickinson College, a selective private liberal arts college located in Carlisle, Pennsylvania.[5] Ikram recently participated in a program in

---

[5] Dickinson College was founded by Dr. Benjamin Rush, a signer of the Declaration of Independence, in 1783. Currently there are some 2,370 students at the College.

17

Israel sponsored by the college focused on conflict resolution among Israelis and Palestinians.  He recounts times when the defendant intervened to stop a shoplifter and a time when he defended a fellow student from some bullies. He notes that Imran Rabbani volunteered to bring food to the mosque and to clean the kitchen there. Like his brother Inam, Ikram promises to help guide and support the defendant.

Despite his own natural talent, Imran Rabbani could not hope to compete with his older brothers. Imran was thought of as a slow learner in elementary school and, as a consequence, attended English as a Second Language classes. Over time, however, he improved in school but seemed to lose interest for a time in high school.  During his junior year and in the first semester of his senior year, Imran appeared to lose interest in school and began focusing more intently on working outside of school. He first worked at a pizza shop and put in as much as three afternoons a week there. He later obtained work at a grocery store, a pharmaceutical company owned by family friends, a video production company and a religious not-for-profit. In those days, Imran wanted to earn his own money, partly because his father could not fully provide for the family. In fact, Ghulam Rabbani and the defendant held a joint bank account and his father often withdrew money Imran earned as necessary to support the family.

As the Court learned at the transfer hearing, Imran's young life was far from spotless. He took his neighbor's car for an unauthorized Halloween 2012 "joy ride" and was arrested driving "doughnuts" in a Home Depot parking lot. Imran was scolded by his parents but his older brother, Inam, had a more extreme reaction: he stopped speaking to Imran for two years all the while living with him in the same small apartment. Imran also took advantage of the pharmaceutical firm where he worked by writing himself extra checks until his

forgeries were discovered. And the government obtained, by search warrant, a list of bad acts for which the defendant felt guilty, including stealing from employers and others. Imran's conduct in this regard is far from commendable but his personal acknowledgment of its wrongfulness demonstrates his capacity for change. Notably, the conduct for which he has been convicted in the instant case is completely different from this immature history of theft.

By the start of 2015, Imran began to turn toward Islam not out of some fanatical attachment to ISIL but instead as a means of seeking support from his community. The Director of his mosque, Abdelghani Benyahya, describes the defendant as "an immensely courteous and kind person" who is "just a normal teenager." As the government has acknowledged, his mentor from that community, Farooq Mirza, advised him to stay away from Mr. Saleh. In fact, Imran did turn his attention back to school and completed sufficient classes so that he was able to graduate with a Regent's diploma. Imran developed a close relationship with Mr. Mirza. According to a letter submitted by Imran's parents, Mr. Mirza needed to donate part of his liver to his mother but could not unless he lost weight. Imran Rabbani accompanied Mr. Mirza to the gym several times a week to help him get in shape for the operation.

Imran was far from a washout at John Bowne High School. He made a positive impression on some of his teachers, including Martin Levy, a Social Studies teacher. Mr. Levy has taught thousands of high school students but Imran stands out for the respect his showed, for his personal warmth, for his thoughtfulness and his caring nature. Mr. Levy has no reason to believe that the defendant presents any sort of danger to the community and, to the contrary, views him as "one of the most respectful and supportive students" he has

ever had.

Imran offered his help to other students at the high school. Back in 2011, he met a young man who had just arrived in the United States, Sarmad Karatela. He helped Mr. Karatela adjust to the high school routine and translated English to Urdu for him. They joined the cricket team and founded the Muslim Students Association together. Mr. Karatela, now a student at Queens College, believes that Imran was instrumental in assisting him in assimilating into American society.

Imran developed a friendship –a platonic relationship– with a young woman with whom he attended John Bowne High School, Prema Saha. Ms. Saha, a non-Muslim, describes how Imran always made an effort to help others including those outside his race and religion. He urged her to focus on school and to value education. Together, they planned to work during the summer of 2015 to help the homeless. She "has never met anyone so genuine and selfless, full of integrity and compassion." Ms. Saha, who will start her sophomore year at Pace University this September, believes that Imran is worthy of the second chance she hopes the Court will offer him.

Mr. & Mrs. Rabbani have seen their son become more goal oriented during this last year. Despite his imprisonment at the Essex County Juvenile Detention Facility, Imran has become more focused than ever on his education. He took three college level courses through the Essex County College High School Readiness Program: Psychology, College Math and a College Success Seminar—and received an A in each course.

While detained as a result of the charges in this case, the defendant received (1) an Award of Excellence from Sojourn High School, (2) an Award of Excellence in English/Language Arts, (3) Certificate of Excellence from Sojourn College, and (4) a

Certificate for his "outstanding work" as "head defense" in the May 11, 2016 Law Day Mock Trial sponsored by Sojourn High School and Rutgers School of Law. Copies of these certificates are attached to this memorandum. He reports that his experience in the Mock Trial was exciting and caused him to think about his future career choices.

According to Rutgers Law Professor Laura Cohen, Imran Rabbani's performance as lead defense counsel at the Mock Trial was nothing short of stunningly good. "In the eight years that I have overseen this program, I have never encountered a young person as analytical, intellectually nimble, and engaged in the exercise as he. He made eloquent, fluid, and analytical legal arguments, raised accurate and well thought-out objections, and conducted skilled direct and cross-examinations. His ability to think on his feet would have been remarkable for a law student; for a young man barely out of high school, it was stunning." It is clear that the defendant shows remarkable promise.

During this last year, Imran worked with a psychologist at the Essex County Juvenile Detention Facility, Dr. Linda June. In her April 19, 2016 Progress Report, she found that he was acutely anxious when she first met him. She explains the difficulties he experienced being raised in a traditional Pakistani family while attending a secular, public school, particularly during his adolescent years. He wanted to date girls his age but this presented a cultural conflict. Imran is self-critical and often compares himself to his more successful brothers and yet Dr. June has seen him focus on education in taking three college-level courses during his detention. In addition, Imran visits with his parents every weekend and he is closer to them than ever.

The detention facility held the defendant in administrative segregation or the equivalent of solitary confinement from June to November 2015. Apparently, the facility

21

made this decision after learning of the nature of the initial charges but, after counsel intervened, Imran was permitted into general population. His anxiety level then decreased.

According to Dr. June, the defendant has some insight into his prior focus on acquiring material things such as new clothing and accessories. Although he does not suffer from any mental illness, he has benefitted from therapy with her.

Dr. June notes that Imran gets along well with other youngsters in the facility, not all of whom are as well-adjusted. According to Dr. June, "Imran has never received any misconduct reports and is always cooperative and respectful towards staff and other residents. If any residents try to annoy Imran he is able to ignore it and not become involved in any fights."

Mr. Rabbani is a young man for whom, in spite of the felony conviction he will carry with him, the future will present opportunities he is anxious to grasp. He has the support of his family and friends. Fortunately, he can expect the support not only of his parents but also of his capable and successful brothers.

Nonetheless, the Court should be mindful that adverse collateral consequences will result from this felony conviction in this case. As recently described by Judge Block in *United States v. Nesbeth*, 2016 U.S. Dist. LEXIS 68731 (E.D.N.Y. May 24, 2016), a felony conviction will prevent him from acquiring work in a variety of fields including Child Care, the AmeriCorps program, Pharmaceutical, Transportation, Hospice Work, Bank or Financial Industries; he cannot enlist in the Armed Forces or join a Labor Union, nor can he ever be eligible for Disaster Assistance or to adopt a child or be a foster parent. Indeed, "it is the obligation of both the defense lawyer and the prosecutor, as well as the Probation Department in the preparation of its PSR, to assess and apprise the court, prior to

sentencing, of the likely collateral consequences facing a convicted defendant." *Id*. at * 48-49.

Imran Rabbani plans to attend a four-year college and to start a career. He has expressed interest in many career paths but, at the age of 18 years, he should not be expected to know whether he will want to be an engineer, a physician's assistant, a psychologist, or an attorney. But we do know that this ambitious young person shows promise and deserves a chance in spite of the fact that he has committed a serious crime.

<u>Other 3553(a) Factors</u>

One of the 3553(a) factors is "the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." 18 U.S.C. § 3553(a)(2)(A). Here, Imran Rabbani has been punished, having served 13 months' imprisonment which is the equivalent of a 15 month sentence with "good time." A sentence of "time served" is a sentence of imprisonment commensurate with the offense in question—conspiring to interfere with the surveillance officers. Another factor for the Court to consider is any need there may be to protect the public from future crimes of the defendant, 18 U.S.C. § 3553(a)(2)(C), but there is no reliable proof that Mr. Rabbani presents any likelihood of recidivism. And we expect the Court to impose a term of up to three years' supervised release that will provide the Court with some assurance that his behavior will be monitored not only by his family, but also by the Probation Department. Indeed, the sentence should provide the defendant with an opportunity for "needed educational or vocational training," 18 U.S.C. § 3553(a)(2)(D); we respectfully submit that the defendant's educational opportunities are far greater while serving a term of supervised release or probation than they would be while serving a term of imprisonment.

23

## Acceptance of Responsibility

The defendant has told us he deeply regrets confronting the officer and sees that the officer would likely have seen him as posing a threat that morning. He admits his guilt but also feels guilty. While he did not intend to commit a crime of violence, he accepts that he is guilty of impeding and interfering with the duties of the agents. He pleaded guilty and has prepared himself for whatever sentence the Court deems appropriate.

During his imprisonment, Imran has been educating himself, not just complaining as many others do. His extraordinary efforts to advance his education while detained evince his desire to better himself and manifest his acceptance of responsibility not only of his personal guilt but also of his own destiny.

## Conclusion

As we have pointed out, the defendant's offense took place when he was 17 years old and did not reflect any plan to commit an act of violence. The defendant acknowledges his own guilt and has expressed remorse. We respectfully recommend that the Court impose a sentence of time served to be followed by three years' supervised release which we submit would be sufficient and not greater than necessary.

Dated:      July 7, 2016
            White Plains, New York

                                    Respectfully submitted,

                                    /s/_____
                                    RICHARD D. WILLSTATTER
                                    *Attorney for Imran Rabbani*
                                    Green & Willstatter
                                    200 Mamaroneck Avenue, Suite 605
                                    White Plains, New York 10601
                                    (914) 948-5656