

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

SDD:AAS/DMP/ICR  *271 Cadman Plaza East*
F. #2015R00096  *Brooklyn, New York 11201*

August 3, 2016

By ECF

The Honorable Margo K. Brodie
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

      Re:    United States v. John Doe
                  Criminal Docket No. 15-302 (MKB)

Dear Judge Brodie:

      The government respectfully submits this letter regarding sentencing in the above-referenced matter, currently scheduled for August 9, 2016 at 10 a.m. The Presentence Investigation Report (the "PSR"), disseminated by the United States Probation Department on June 29, 2016 and amended on July 26, 2016 (the "Addendum"), contemplates an advisory United States Sentencing Guidelines ("Guidelines" or "U.S.S.G.") range of imprisonment of 30 to 37 months, based on a total offense level of 19 and a criminal history category of I. For the reasons articulated below, the government respectfully submits that a sentence of imprisonment at the higher end of the Guidelines sentencing range calculated by the Probation Department is appropriate.

I.    Background

      A.    The Islamic State of Iraq and the Levant

      The relevant offense conduct relates to the defendant's interest in a foreign terrorist organization. Accordingly, some knowledge of the relevant entity may be helpful for the Court in assessing the seriousness of the defendant's conduct.

      As the Court is likely well aware, the Islamic State of Iraq and the Levant ("ISIL") is a foreign terrorist organization that, since 2013, has claimed credit for numerous terrorist activities, including seizing Mosul, a city in northern Iraq, and launching rocket attacks on eastern Lebanon in March 2014. These terrorist activities are part of ISIL's

broader goal of forming an Islamic state or "caliphate" in Iraq and Syria. On October 15, 2004, the United States Secretary of State designated al-Qa'ida in Iraq (AQI), then known as Jam'at al Tawhid wa'al-Jihad, as a Foreign Terrorist Organization ("FTO") under Section 219 of the Immigration and Nationality Act and as a Specially Designated Global Terrorist under section 1(b) of Executive Order 13224. On May 15, 2014, the Secretary of State amended the designation of AQI as a FTO under Section 219 of the Immigration and Nationality Act and as a Specially Designated Global Terrorist under section 1(b) of Executive Order 13224 to add the alias Islamic State of Iraq and the Levant as its primary name. The Secretary also added the following aliases to the ISIL listing: the Islamic State of Iraq and al-Sham, the Islamic State of Iraq and Syria ("ISIS"), ad-Dawla al-Islamiyya fi al-'Iraq wa-sh-Sham, Daesh, Dawla al Islamiya, and Al-Furqan Establishment for Media Production. On September 21, 2015, the Secretary added the following aliases to the ISIL listing: Islamic State, ISIL and ISIS. Although the group has never called itself "Al-Qaeda in Iraq," this name has frequently been used to describe it through its history. To date, ISIL remains a designated FTO.

On or about May 14, 2015, ISIL released an audio recording, purportedly containing a message from ISIL leader Abu Bakr al-Baghdadi, in which he urged Muslims to take up arms on behalf of ISIL by either traveling to Syria to fight for ISIL or launching attacks wherever they were. Specifically, al-Baghdadi was quoted as stating, "There is no excuse for any Muslim not to migrate to the Islamic State . . . . Joining is a duty on every Muslim. We are calling on you either join or carry weapons [to fight] wherever you are." This audio statement echoed calls during that time frame by pro-ISIL radio stations and social media for ISIL supporters to either travel to Syria to fight on behalf of ISIL or to launch attacks wherever the ISIL supporters may be located. (PSR ¶¶ 3-4).

B.  The Defendant's Arrest and the Charged Conspiracy

During the spring and early summer of 2015, members of the Joint Terrorism Task Force in New York City were investigating a group of likeminded individuals who sought to provide material support to ISIL. This group included, among others, the defendant, who was then a high school senior, and Munther Omar Saleh, who was a student at an aeronautical college in Queens. The investigation revealed that Saleh had obtained instructions for the creation of a pressure cooker bomb and had informed a confidential source that he was in New York and that he planned to conduct an "Op," understood to refer to an "operation" to carry out a terrorist attack. (PSR ¶ 5). The investigation further revealed that Saleh recruited three individuals from New Jersey to travel to Syria to join ISIL.

Beginning in the spring of 2015, members of law enforcement observed the defendant repeatedly meet with Saleh. During this period of time, the defendant exhibited a pattern of conduct indicating an increased interest in physical violence coupled with jihadist ideology. On March 15, 2015, the defendant purchased online a Smith & Wesson "SWFRS First Response Serrated Knife", after having purchased a "New Browning LM368 Wood Handle Survival Bowie Hunting Pocket Folding Knife KB05" and a "NAVY SEALS Rescue

2

Pocket Knife." (PSR ¶ 6). In addition, monitored communications involving the defendant demonstrated that the defendant espoused support for violent Islamic extremist ideology:

- On May 11, 2015, the defendant wrote Saleh: "I've been looking more into it . . . we should talk in person . . . we have this Friday too so you can tell me more about it . . . it just makes sense." Saleh responded, "U mean establishing Islam the same way the Prophet (saaws) did? We can meet up whenever ur free." The defendant replied, "Yeah and dude it's like their doing it step by step and perfectly . . . The exact ways and rules of the prophet . . . I was watching an inside doc on dawlah [ISIL]."[1] The defendant and Saleh then agreed to meet in person. (PSR ¶ 7).

- Later on May 11, 2015, the defendant informed Saleh that he was driving to retrieve Saleh from Saleh's house. Saleh asked where they were going and the defendant responded, "Dawla [ISIL], no kiddin', the masjid [the mosque]," as they laughed. (PSR ¶ 7).

- On May 15, 2015, the defendant sent Saleh a link to a YouTube video displaying the ISIL flag and propaganda about ISIL's occupation of Syria. The next day, the defendant notified Saleh that U.S. military forces had recently killed a senior member of ISIL. (PSR ¶ 8).

- On May 28, 2015, the defendant told Saleh that "Islamic State is everywhere." (PSR ¶ 8).

- On May 29, 2015, the defendant referred to Saleh as his "Mufti [Islamic legal scholar] hotline" and "Sheik hotline." The defendant warned Saleh that he believed he was the subject of law enforcement surveillance while driving and that he had attempted to evade the surveillance. The defendant noted that both he and Saleh had previously noticed that they were being followed by law enforcement officers and voiced his suspicion that their telephone calls were being monitored. Saleh recommended that the defendant place a camera inside his car to determine if law enforcement was surreptitiously entering the vehicle. (PSR ¶ 8).

- On June 1, 2015, the defendant and Saleh discussed Saleh's recent meeting with another coconspirator, Fareed Mumuni, who later that month attacked with a large knife a member of law enforcement

---

[1] All citations to communications herein contain original errors in grammar, spelling, and punctuation.

3

    executing a search warrant at Mumuni's residence in Staten Island. After Saleh described the meeting as "awesome," and the defendant stated that he wanted to be invited for future meetings in Staten Island, Saleh remarked that the meeting was "motivating, it was great." At this meeting, Mumuni and Saleh discussed conducting a terrorist attack in the New York metropolitan area in locations such as Times Square or the aeronautical college attended by Saleh. (PSR ¶ 8).

- On June 2, 2015, the defendant commented to Saleh on the futility of peaceful protest and the need to violate the law in order to effect change: "It's so sad to see people think posting on Facebook or protests actually do something for Palestine . . . I went to 3 . . . And screamed my voice out . . . Not a single thing changed . . . I did nothing . . . Nothing for those children." Saleh responded, "Yea subhan Allah, that didn't Change anything for the prophets (a.s.), and definitely won't change anything for us." The defendant noted, "Sitting around doesn't do anything . . . Never did and never will." Saleh responded, "Look at the examples of prophets, not many prophets achieved greater expansion and success except that they broke the rules of the shaytans [devils] of mankind," and stated, "these protests are established by people who are honoring the laws of the Shaytan [devil]." (PSR ¶ 9).

- On June 9, 2015, the defendant told another individual that he knew that he was under law enforcement surveillance and that his telephone calls were being intercepted, and discussed methods to evade law enforcement surveillance, including the use of encrypted text messaging applications. In fact, a search of the defendant's phone after his arrest revealed that he had been communicating with Saleh through an encrypted messaging application. (PSR ¶ 9).

- On June 12, 2015, the defendant engaged in a discussion with another individual about religious beliefs. After the interlocutor commented about being bothered by the police after assisting homeless persons because it is considered a crime, the defendant explained that he "don't go by those laws," noted "I'm down for the trouble," and further stated "[e]ven if l did get arrested, I'd be happy [because] we did [it] for a right reason." (PSR ¶ 9).

The defendant's Internet activities during May and June 2015 also reflected the defendant's increasing fascination with extremist ideology:

- On May 17, 2015, the defendant accessed Internet news articles pertaining to ISIL and the 2013 Boston Marathon bombing, which was

4

>perpetrated with pressure cooker bombs prepared by American youths. (PSR ¶ 8).

- On June 10, 2015, the defendant accessed several websites related to ISIL and jihadist ideology. (PSR ¶ 10).

Additionally, in the days leading up to the arrest, financial records obtained from Chase revealed that the defendant had recently emptied his bank account by withdrawing approximately $1,000 in cash, which constituted abnormal account activity for the past year. Notably, the bomb-making instructions in Saleh's possession advised that purchases of bomb-making materials should be made in cash. (PSR ¶ 9).

During the night of June 12, 2015 through the early morning of June 13, 2015, members of law enforcement performed physical surveillance on the defendant and Saleh. The defendant and Saleh left from a mosque in an SUV vehicle (the "SUV") driven by a co-conspirator ("CC"). After briefly visiting a car wash, the SUV made several anti-surveillance maneuvers, including driving at a high speed through a parking lot with the lights turned off, going through stop signs without stopping, and then quickly accelerating behind a law enforcement vehicle performing surveillance on the SUV. At approximately 4:00 a.m., the SUV stopped for a red light signal at 20th Avenue, on an overpass near the Whitestone Expressway in Queens; a law enforcement vehicle was trailing behind the SUV. Saleh and the defendant simultaneously exited the SUV and took several steps towards the law enforcement vehicle, before both stopped and returned to the SUV. At the time, Saleh had an unopened folding knife in his hand, which he then placed in his pocket. Moments, later, Saleh and the defendant again exited the SUV and ran from opposite sides of the SUV towards the law enforcement vehicle. In order to evade the attackers, the law enforcement officer had to back his car in reverse off the overpass and through the intersection immediately before the overpass, at the risk of backing his vehicle into oncoming traffic. A back-up law enforcement vehicle soon arrived, and responding law enforcement officers ordered Saleh and the defendant to the ground. A pat-down of the defendant revealed a Smith & Wesson tactical folding knife tucked into his waistband, while Saleh was found in possession of a folding knife. Saleh later admitted in his post-arrest interview that the unopened knife had been in his hand as he initially menaced the law enforcement vehicle. (PSR ¶ 11).

Following his arrest, the defendant waived his Miranda rights in the presence of his father and mother and answered questions about his activities and his relationship with Saleh and other coconspirators. In pertinent part, the defendant acknowledged that Saleh wanted to join ISIL and was trying to recruit the defendant, and commented that the FBI needed to "stop" Saleh. The defendant also acknowledged that a mentor had encouraged him to maintain a distance from Saleh. (PSR ¶ 12).

During the interview, the defendant repeatedly lied to agents about his relationship with Saleh, his communications regarding ISIL, and even his knowledge that the vehicle he had charged was operated by a law enforcement officer. For example, the

defendant admitted that he knew that Saleh held extremist beliefs, at one point stating that he simply assumed that Saleh's associates shared those beliefs because of their association with Saleh. The defendant denied holding violent extremist beliefs himself. These statements contradicted, however, the defendant's own communications with Saleh, in which he described Saleh as his "mufti." The defendant explained in his post-arrest interview that a "mufti" is someone who has studied religion to such an extent that they have a doctorate in religion. The defendant also denied knowing that the black-tinted surveillance vehicles that he had observed following him were, in fact, law enforcement vehicles. However, the defendant's associates informed agents that, days before his arrest, the defendant had indicated that the government was probably following him.

A search of the defendant's residence uncovered, among other items, a box containing a large quantity of cash, as well as a notebook outlining the defendant's past bad acts and deeds, including the notation "Stole nearly $3500 from Adil Pharmacena." The government later confirmed that the defendant had been employed by Pharmacena and had stolen approximately $3100 to $3500 by writing and cashing duplicate checks. The defendant repaid $3300 to Pharmacena. (PSR ¶ 13).

In his interview with the Probation Department, the defendant admitted knowing that Saleh was an ISIL supporter who maintained friendships with ISIL supporters in New Jersey. Though denying that he himself was ever an ISIL supporter, the defendant acknowledged that he had become "confrontational" with law enforcement officers performing surveillance on him. (PSR ¶ 17).

    C.    <u>Procedural History</u>

On June 13, 2015, the U.S. Attorney's Office for the Eastern District of New York charged the defendant in a one-count juvenile information with conspiring to provide material support to ISIL, in violation of Title 18, United States Code, Section 2339B(a)(1). On April 8, 2016, the defendant consented to be prosecuted as an adult and pleaded guilty before the Honorable Robert M. Levy to a one-count superseding information charging a conspiracy to impede federal officers by force, intimidation, and threat to leave the place where their duties as officers were required to be performed, in violation of Title 18, United States Code, Section 372.

On July 26, 2016, the Probation Department disseminated the Addendum, which contemplates an advisory Guidelines sentencing range of 30 to 37 months, based on a total offense level of 19 and a criminal history category of I.[2]

---

[2] In the plea agreement, the government estimated that the Guidelines range was 41 to 51 months based upon the inclusion of a three-level enhancement for brandishing a weapon. The government no longer seeks to apply such an enhancement and agrees that the advisory Guidelines range of 30 to 37 months' imprisonment calculated by the Probation Department is correct.

6

II.  Applicable Law

It is settled law that "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." Gall v. United States, 552 U.S. 38, 49 (2007) (citation omitted). Next, a sentencing court should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, [it] may not presume that the Guidelines range is reasonable. [It] must make an individualized assessment based on the facts presented." Id. at 50 (citation and footnote omitted).

Title 18, United States Code, Section 3553(a) provides that, in imposing sentence, the Court shall consider:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed--
>
> > (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> >
> > (B) to afford adequate deterrence to criminal conduct; [and]
> >
> > (C) to protect the public from further crimes of the defendant.

Section 3553 also addresses the need for the sentence imposed "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2)(D). "[I]n determining whether to impose a term of imprisonment, and, if a term of imprisonment is to be imposed, in determining the length of the term, [the Court] shall consider the factors set forth in section 3553(a) to the extent that they are applicable, recognizing that imprisonment is not an appropriate means of promoting correction and rehabilitation." 18 U.S.C. § 3582(a).

It is well-settled that, at sentencing, "the court is virtually unfettered with respect to the information it may consider." United States v. Alexander, 860 F.2d 508, 513 (2d Cir. 1988). Indeed, Title 18, United States Code, Section 3661 expressly provides that "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." Thus, the Court must first calculate the correct Guidelines range, and then apply the 3553(a) factors to arrive at an appropriate sentence, considering all relevant facts.

In addition, the Court has broad discretion to impose special conditions of supervised release so long as those conditions are reasonably related to the Section 3553(a) factors, involve no greater deprivation of liberty than is reasonably necessary to achieve the

purposes of sentencing, and are consistent with policy statements issued by the Sentencing Commission. See 18 U.S.C. § 3583(d); United States v. MacMillen, 544 F.3d 71, 75-76 (2d Cir. 2008) (upholding special condition of supervised release that a defendant who possessed child pornography not frequent areas where children are likely to congregate); United States v. Johnson, 446 F.3d 272, 281-83 (2d Cir. 2006) (upholding special condition that a defendant who used the Internet to have sexually explicit conversations with minors and to lure them to meetings not use or possess any computer capable of accessing the Internet).

III.  The Appropriate Sentence of Imprisonment and Supervised Release

    A.  Applying the Section 3553(a) Factors

The government respectfully submits that a term of imprisonment at the higher end of the Guidelines range of 30 to 37 months is appropriate given the specific facts at issue in this case. Such a sentence would be consistent with 18 U.S.C. § 3553(a), which requires the Court to consider a number of factors in imposing sentence, including the nature and circumstances of the offense and the history and characteristics of the defendant (§ 3553(a)(1)); the need for the sentence to reflect the seriousness of the violation, to promote respect for the law, and to provide a just punishment for the violation (§ 3553(a)(2)(A)); and the need for the sentence to afford adequate deterrence to criminal conduct (§ 3553(a)(2)(B)) and to protect the public from further crimes or violations of the defendant (§ 3553(a)(2)(C)).

The defendant's submission focuses on the defendant's history and characteristics. (Def. Mem. at 16-22). The government acknowledges that the defendant's youthful age is a general mitigating factor. Indeed, it is a mitigating factor that the government considered in exercising its discretion to permit the defendant to plead guilty to the instant offense, rather than the significantly more serious charge that the defendant conspired to provide material support to a foreign terrorist organization. The basis of that latter charge included evidence that in the days leading up to the defendant's assault on law enforcement with his coconspirator Saleh, a man he later admitted to knowing was a fervent supporter of ISIL and violent extremist ideology, the defendant chose to spend considerable time with Saleh, made statements to Saleh indicating that he supported ISIL's ideology and methods, and openly displayed hostility to law enforcement agents that he (correctly) suspected of following him. In circumstances such as these, where the underlying facts demonstrate that the defendant's conduct was significantly more dangerous than the minimal conduct required to support a conviction for the charged offense, and where the defendant has already been afforded considerable leniency in the government's charging decision in part because of his maturity, the government submits that the Court should assign minimal weight to the defendant's arguments regarding the defendant's purported emotional maturation.

As noted above, the sentence imposed must also deter the defendant from committing further crimes and promote respect for the law. These factors both counsel in favor of a sentence of imprisonment at the higher end of the Guidelines range. The evidence

demonstrates that the defendant informed Saleh in intercepted communications that peaceful protest was ineffective and that breaking the law was the only way to effect change. Taken in the context of the defendant's pro-ISIL rhetoric and eagerness to participate in future meetings with Mumuni and Saleh, who were plotting a domestic terror attack in support of ISIL, the record establishes that the defendant failed to engage in truly catastrophic action only because of continued government intervention through surveillance and the defendant's eventual arrest. The seriousness of the defendant's conduct speaks for itself and weighs heavily in the Section 3553(a) analysis. Similarly, given the seriousness of the defendant's conduct, the Court must also give due consideration to the need to protect the public from further crimes of the defendant. The government respectfully submits that this factor also requires imposition of a sentence of imprisonment falling in the higher-end Guidelines range.

Considering all of these factors, the government respectfully submits that a sentence of imprisonment at the higher end of the applicable Guidelines range of 30 to 37 months' imprisonment is justified in this case.

B.  Special Conditions of Supervised Release

In addition to a term of incarceration at the higher end of the Guidelines range, the government also respectfully requests that the Court impose the maximum term of supervised release of three years, including any standard conditions of supervised release, in addition to the following special conditions of supervised release:

1)   No contact with co-conspirators Munther Omar Saleh and Fareed Mumuni;

2)   Real-time monitoring of the defendant's internet activity by the Probation Department, including allowing Probation Officers to search (including but not limited to a forensic examination), and capture evidence of violations from, any communication devices (e.g., phones, tablets, computers or devices with Internet access or communication capabilities), email accounts, social media accounts or electronic communication accounts within the possession, custody or control of defendant between 6 a.m. and 10 p.m.;

3)   No knowing communications with anyone who is engaged in providing, or attempting or conspiring to provide, material support to a designated "Foreign Terrorist Organization," as defined in 8 U.S.C. § 1189, concerning provision of support to any such Foreign Terrorist Organization, or with persons who are, or claim to be, involved with acts of violence to effect political change or advocating acts of violence to effect political change, concerning engagement in such acts of violence;

4)   Notification to the Probation Department prior to: (a) the purchase of any cellular phone or any device that can access the Internet; and (b) the creation of new online accounts including email, social media, instant messaging, chat accounts or services. Under this special condition, such information would be

9

          shared with the United States Attorney's Office for the Eastern District of New York per the search condition set forth above; and

     5)     Periodic meetings with mental health professionals and mentors who have experience with Islamic extremism during the term of supervision as directed by the Probation Department. The mental health professional and mentor shall be selected with the assistance and approval of the United States Attorney's Office for the Eastern District of New York.

       The government respectfully submits that the proposed special conditions of supervised release are appropriate in light of the defendant's conduct during the spring of 2015 indicating his increased interest in physical violence coupled with extremist ideology, his increasingly poor school attendance record during that time, his spending time with Saleh despite warnings from multiple individuals to stay away from Saleh in light of Saleh's demonstrated support for violent extremist ideology, and his efforts with Saleh to intimidate members of law enforcement while armed with tactical knives that ultimately led to his arrest in this case. The proposed special conditions of supervised release will help ensure that the defendant abandons the dangerous path that was disrupted by his arrest and are targeted to further the important societal goal of protecting the public, by minimizing the defendant's potential for future physical violence coupled with extremist ideology. See United States v. Myers, 426 F.3d 117, 124 (2d Cir. 2005) ("[W]hen a fundamental liberty interest is implicated by a sentencing condition, we must first consider the sentencing goal to which the condition relates . . . .").

       Further, the proposed special conditions are sufficiently narrowly tailored to provide the defendant a "reasonable opportunity to know what is prohibited." United States v. Balon, 384 F.3d 38, 43 (2d Cir. 2004). As discussed above, the Court has broad discretion to impose special conditions of supervised release so long as those conditions are reasonably related to the Section 3553(a) factors, involve no greater deprivation of liberty than is reasonably necessary to achieve the purposes of sentencing, and are consistent with policy statements issued by the Sentencing Commission. See Myers, 426 F.3d at 124 ("We must . . . consider whether [the proposed special condition" represents a greater deprivation of liberty than is necessary to achieve that [sentencing] goal.").

       The Second Circuit's analysis in Balon is particularly relevant to those special conditions requested in this case which contemplate notification to the Probation Department of the use of new computer or cellular phone devices, or new email, electronic communication, or social media accounts, as well as real-time monitoring and physical search of such computers or devices. In Balon, the Second Circuit affirmed a provision of supervised release for a defendant convicted of a child pornography offense requiring the defendant to "provide the U.S. Probation Office advance notification of any computer(s), automated service(s), or connected device(s) that he will use during his term of supervision." 384 F.3d at 43. The Second Circuit noted with approval that the condition required the defendant to "notify the probation office only of the use of computers able to obtain, store, or transmit sexual depictions of, or illicit sexual information on, children," while serving the

10

legitimate government interest of "monitor[ing] and deter[ing] [the defendant] from obtaining such information through any computer." Id. At the same time, the Second Circuit found that another provision permitting the Probation Department to install monitoring equipment in any such computer and remotely monitor the defendant's Internet activities would likely be permissible under the Fourth Amendment: "The use of monitoring software that allows a user with the right skills (perhaps like [the defendant] time to delete files or other information would clearly fail to meet the needs of supervised release. Therefore, the extent to which the 'remote monitoring' provision involves a greater deprivation of liberty than reasonably necessary is governed by technological considerations." Id. at 45-46. Therefore, the Balon court dismissed portions of the appeal related to live monitoring of such computers of devices as unripe, pending possible development of "software and monitoring techniques . . . that can effectively monitor [the defendant]'s computer use in a way less intrusive than the special conditions or if the pace of technology has rendered them ineffective." Id. at 46-47. Here, the proposed special conditions are no more intrusive than those approved by in Balon, and are, in fact, less intrusive than the blanket ban on use or possession of a computer or device to access the Internet, approved by the Second Circuit in Johnson. Johnson, 446 F.3d at 281-83; but see United States v. Sofsky, 287 F.3d 122, 127 (2d Cir. 2002) (vacating a blanket ban on computer and Internet access as a condition of supervised release, while articulating that "a more focused restriction, limited to pornography sites and images," would pass muster). These proposed special conditions are appropriate in light of the defendant's Internet activities, which included research and communications with others regarding violent Islamic extremist ideology.

Similarly, the requested special condition prohibiting knowing communications with supporters of "Foreign Terrorist Organizations," as defined in 8 U.S.C. § 1189, or persons claiming to be involved in acts of violence or encouraging acts of violence is also sufficiently tailored under Second Circuit law to provide the defendant reasonable notice as to permissible and prohibited conduct under the terms of his release. Indeed, the term "Foreign Terrorist Organization" has a defined statutory meaning, see United States v. Green, 618 F.3d 120, 123-24 (2d Cir. 2010) (approving special condition prohibiting the defendant from associating with members of criminal street gangs that he knew, where "criminal street gang" is defined in federal statute), and persons who are, or claim to be, involved with acts of violence or advocating acts of violence, is "sufficiently clear to provide the defendant with notice of what conduct is prohibited," id. at 124. Moreover, the proposed special condition only prohibits intentional communications with such persons regarding the provision of support to designated foreign terrorist organizations or regarding the engagement in violence to achieve political change. As noted above, these proposed special conditions are appropriate in light of the defendant's repeated communications with and efforts to involve himself with other individuals who sought to engage in violent activity on behalf of a designated foreign terrorist organization.

Finally, the Court has authority to impose as a condition of supervised release participation in a mental health program "[i]f the court has reason to believe that the defendant is in need of psychological or psychiatric treatment." U.S.S.G. § 5B1.3(d)(5); accord 18 U.S.C. § 3563(b)(9). This provision does not specify that the need for psychiatric

11

treatment be related to the offense of conviction. See United States v. Johnson, 998 F.2d 696, 699 (9th Cir. 1993) (Kozinski, J.). For example, the Second Circuit has articulated that sex offender mental health treatment may be appropriate, even in a case where the charge of conviction was not child pornography but where the defendant's history and characteristics revealed a troubling predilection for child pornography. See United States v. Dupes, 513 F.3d 338 (2d Cir. 2008). Here, the record establishes a troubling pattern of the defendant's behavior leading to his arrest in this case, as well as frequent association with an individual planning a domestic terror attack in support of ISIL – the person with whom the defendant menaced a member of law enforcement. Moreover, the government is not requesting enrollment in an in-patient program, but rather periodic meetings with a mental health professional and mentor selected with the assistance and approval of the government.

IV.     Conclusion

For the reasons articulated above, the government respectfully requests that the Court impose a term of imprisonment at the higher end of the applicable Guidelines range of 30 to 37 months of incarceration followed by a three-year term of supervised release with the special conditions set forth above.

Respectfully submitted,

ROBERT L. CAPERS
United States Attorney

By:     /s/ Alexander A. Solomon
Alexander A. Solomon
Douglas M. Pravda
Ian C. Richardson
Assistant U.S. Attorneys
(718) 254-7000

cc:     Clerk of the Court (MKB) (by ECF)
Richard Willstatter, Esq. (by ECF)